**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

CHESTNUT HILL NY, INC., JOHN DOE #1, JOHN DOE
#2, John DOE #3, and JOSEPH SANGIOVANNI,

                             Plaintiffs,

v.

CITY OF KINGSTON, CITY OF KINGSTON OFFICE
OF PLANNING, and BUILDING SAFETY AND
ZONING ENFORCEMENT OF THE CITY OF
KINGSTON,

                             Defendants.

1:23-cv-01024 (BKS/DJS)

---

**Appearances:**

*For Plaintiffs:*
Lanny E. Walter[1]
301 Van Vlierden Road
Saugerties, New York 12377

Thomas J. Minotti
Law Offices of Thomas J. Minotti, P.C.
1131 Route 55, Suite 6
Lagrangeville, New York 12540

*For Defendants:*
Barbara Graves-Poller
Matthew Jankowski
Corporation Counsel
City of Kingston
420 Broadway
Kingston, New York 12401

---

[1] Attorney Lanny E. Walter no longer represents Plaintiffs in this case; on September 27, 2023, Plaintiffs substituted Attorney Thomas J. Minotti for Attorney Walter. (Dkt. No. 37).

**Hon. Brenda K. Sannes, Chief United States District Judge:**

**MEMORANDUM-DECISION AND ORDER**

## I.       INTRODUCTION

Plaintiffs Chestnut Hill NY, Inc., John Doe #1, John Doe #2, John Doe #3, and Joseph Sangiovanni bring this disability discrimination action against the City of Kingston, the City of Kingston Office of Planning, and the Building Safety and Zoning Enforcement ("Building Safety") of the City of Kingston. (Dkt. No. 1). This action stems from Sangiovanni's operation of "a family group home" or "boarding home" on 106 West Chestnut Street in Kingston, New York ("Chestnut Hill"),[2] that houses individuals who suffer "impairments," including "mental illness," which "substantially limit their major life activities." (*Id.* ¶¶ 1, 54–55). This is the second disability discrimination action against the City of Kingston involving Chestnut Hill. In January 2017, a complaint in *Chestnut Hill v. City of Kingston* (*"Chestnut Hill I"*), No. 17-cv-0095 (BKS/DJS), was filed and this Court issued a temporary restraining order prohibiting the City from evicting Chestnut Hill's residents, *Chestnut Hill I*, No. 17-cv-0095, 2017 WL 11418271, 2017 U.S. Dist. LEXIS 226807 (N.D.N.Y. Feb. 22, 2017). As part of the settlement of that action, the City issued a variance and an annually renewable Special Use Permit enabling Chestnut Hill to continue operating.

Plaintiffs filed the present action on August 21, 2023, after Defendants denied Chestnut Hill's 2023 application to renew its Special Use Permit ("renewal application") and informed Plaintiffs that Chestnut Hill's residents must vacate the property by September 29, 2023. (Dkt. No. 1). The Complaint alleges: (1) disability discrimination in violation of the Fair Housing Act ("FHA"), 42 U.S.C. §§ 3604, et seq.; (2) interference with Plaintiffs' rights under the FHA, in

---

[2] Chestnut Hill NY, Inc. owns 106 West Chestnut Street.

violation of 42 U.S.C. § 3617; (3) disability discrimination, in violation Title II of the Americans

with Disabilities Act ("ADA"), 42 U.S.C. §§ 12131, et seq.; and (4) failure to provide a

reasonable accommodation, in violation of the ADA, 42 U.S.C. § 3604(f)(3)(B). (Dkt. No. 1, at

¶¶ 52–72, 78–80). Plaintiffs seek declaratory and injunctive relief and award of compensatory

and punitive damages. (*Id.* ¶¶ 73–77; *id.* at 12). Presently before the Court are Plaintiffs' motion

for a temporary restraining order ("TRO") and preliminary injunction under Federal Rule of

Civil Procedure 65 seeking to stay the eviction proceedings and maintain the status quo, (Dkt.

No. 5), Defendants' opposition, (Dkt. No. 19),[3] and Plaintiffs' reply, (Dkt. No. 24). On

September 20, 2023, the Court held an evidentiary hearing at which four witnesses testified.

After considering the testimony and the parties' submissions and oral arguments, the Court orally

denied Plaintiffs' motion for a TRO and indicated that a written decision would follow. This is

that decision, including the Court's findings of fact and conclusions of law in accordance with

Rule 52(a)(2).

For the reasons that follow Plaintiffs' motion for a TRO and preliminary injunction is

denied.

## II.    FACTS[4]

### A.    Events Leading to *Chestnut Hill I*

Chestnut Hill "has operated as a boarding house for ill or disabled persons since the

1950s." (Dkt. No. 1, ¶ 17). The house itself "is a three story Victorian structure" and there is a

---

[3] Defendants have cross-moved to dismiss the Complaint under Rule 12(b)(6). (Dkt. No. 19). As the briefing is incomplete, the Court will address Defendants' motion to dismiss at a later date.

[4] The facts are taken from the Complaint, the affidavits and attached exhibits the parties submitted in connection with this motion, and the testimony and evidence presented at the evidentiary hearing. *See J.S.G. ex rel. J.S.R. v. Sessions*, 330 F. Supp. 3d 731, 738 (D. Conn. 2018) ("In deciding a motion for preliminary injunction, a court may consider the entire record including affidavits and other hearsay evidence."); *Fisher v. Goord*, 981 F. Supp. 140, 173 n.38 (W.D.N.Y. 1997) (noting that a "court has discretion on a preliminary injunction motion to consider affidavits as well as live testimony, given the necessity of a prompt decision"). The "findings are provisional in the sense that they are not binding on a motion for summary judgment or at trial and are subject to change as the litigation progresses."

cottage "in the rear" of the property. (Dkt. No. 5-2, ¶ 3). Chestnut Hill NY, Inc., "a for-profit corporation," whose president is Plaintiff Sangiovanni, began leasing the 106 West Chestnut Street property, in October 2014, (Dkt. No. 1, ¶ 4; Dkt. No. 5-2, ¶¶ 1–2), and purchased the property in 2017. (Dkt. No. 5-2, ¶ 2; Dkt. No. 1, ¶ 15).

In or about 2014, Sangiovanni "was in City Hall looking for records with regard to the property" when he encountered the then-mayor of Kingston, Shayne Gallo. (Dkt. No. 1, ¶ 27). When Sangiovanni told Mayor Gallo that he was "interested in operating a top quality boarding house," the mayor responded that "this plan was 'not going to fly'" and told Sangiovanni that if there were "going to be disabled people there he would vehemently oppose the use." (*Id.*).

In late 2014, Sangiovanni applied "for a building permit to relocate a kitchen sink." (*Id.* ¶ 16). Plaintiffs allege that, in response to Sangiovanni's permit application, the City's Corporation Counsel,[5] who resided on West Chestnut Street, challenged the "boarding house's status as a non-conforming use pre-dating the 1963 enactment of zoning in the City." (*Id.*). This led to Chestnut Hill's initiation of an Article 78 proceeding in New York State court regarding the "the City's interpretation of the Zoning Code." (*Id.* ¶ 18).[6] In May 2015, Chestnut Hill's Article 78 proceeding was denied "based upon the conclusion that the boarding house was not a non-conforming use and was not a permitted use in an R-1 District."[7] (*Id.* ¶ 21).

Chestnut Hill appealed to the Kingston Zoning Board of Appeals "arguing that the boarding house was in fact a non-conforming use." (*Id.* ). On or about August 19, 2015, the

---

*trueEX, LLC v. MarkitSERV Ltd.*, 266 F. Supp. 3d 705, 720 n.108 (S.D.N.Y. 2017); *see also Fair Hous. in Huntington Comm. Inc. v. Town of Huntington*, 316 F.3d 357, 364 (2d Cir. 2003).

[5] A predecessor of the current Corporation Counsel.

[6] Plaintiffs allege that while the Article 78 proceeding was pending, "the City Police . . . raided and emptied the subject premises under threat of arrest without proceedings." (*Id.* ¶ 19). The next day, the state court "stay[ed] the enforcement of the alleged zoning violation." (*Id.*).

[7] Section 405-11 of the City of Kingston code defines R-1 as a "One-Family Residence District."

Zoning Board held a series of public hearings on Chestnut Hill's application. (*Id.* ¶ 21).

According to the Complaint, during these hearings, several residents of the City of Kingston

made discriminatory comments. (*Id.* ¶ 28). For example, one long-time resident told the Zoning

Board:

> From reading the newspapers, I understand that they're going to
> have people there with certain disabilities, I suppose this means
> people in wheelchairs, people on crutches or it could be ex-drug
> addicts or ex-alcoholics and this concerns me, like the fellow who
> spoke before me that young people trying to raise families would be
> subject to the kind of people that I suspect may be in this boarding
> house.

(*Id.* ¶ 28 (a)). The Zoning Board denied Chestnut Hill's renovation permit, finding "the

property's proposed use as a boarding house was not a lawful preexisting nonconforming use."

*Tri-Serendipity, LLC v. City of Kingston*, 145 A.D.3d 1264, 1265 (2016); (*see also* Dkt. No. 1, ¶

22).

Chestnut Hill commenced a second Article 78 proceeding. (Dkt. No. 1, ¶ 22). The

Columbia County Supreme Court upheld the Zoning Board's decision that the use of Chestnut

Hill as a boarding house was not a permitted use, (*id.*), and on December 8, 2016, the Appellate

Division, Third Department affirmed.[8] *Tri-Serendipity, LLC*, 145 A.D.3d at 1267. On December

27, 2016, the Kingston Building Safety Division informed Chestnut Hill that "its residents would

have to vacate the building . . . within 30 days," i.e., by January 27, 2017. (Dkt. No. 1, ¶ 25).

On January 27, 2017, Chestnut Hill NY, Inc., Sangiovanni, and others, filed *Chestnut Hill

I* against the City of Kingston and the Building Safety Division, alleging, inter alia, disability

discrimination in violation of the FHA and ADA and denial of a reasonable accommodation and

---

[8] During the second Article 78 proceeding, Chestnut Hill received stays from both the Supreme Court and Appellate Division "enjoining enforcement of the alleged zoning violation." (*Id.* ¶ 23). While these stays were in effect, Kingston police "came to the premises and issued a summons" to a resident of Chestnut Hill for trespassing. (*Id.*).

sought a TRO and preliminary injunction enjoining Defendants from closing Chestnut Hill and removing its residents. *Chestnut Hill I*, Dkt. Nos. 1, 5. The Court granted Plaintiffs' motion for a TRO and scheduled an evidentiary hearing on Plaintiffs' motion for a preliminary injunction. *Chestnut Hill I*, Dkt. No. 19. Following an April 6, 2017, evidentiary hearing, the parties engaged in settlement discussions, including whether Chestnut Hill could apply to the City for a variance. *Chestnut Hill I*, Dkt. No. 43. These discussions continued for more than two years, during which time, the TRO remained in place. *See, e.g.*, *Chestnut Hill I*, Dkt. No. 73 (Text Order entered on July 18, 2019, continuing TRO). Eventually, the Zoning Board of Appeals granted Chestnut Hill a variance. [9] (Dkt. No. 19-41). On November 28, 2018, Chestnut Hill

---

[9] The Resolution provides, in relevant part:

> The applicable zoning regulations and restrictions have caused an undue hardship on the property owner; that the property owner cannot realize a reasonable return in using the premises for any of the of right uses set forth in an R-1 zone; that the hardship established to this Board is unique and not applicable to a substantial portion of the neighborhood and that the hardship was not self-created.
>
> The variance granted herein is the minimum that is required to address the undue hardship.
>
> The premises have been operated as a boarding home for an extended period of time as set forth in the documentary evidence introduced as part of the record.
>
> Insofar as the current long-standing use as a boarding home has been established, the continued operation within the existing parameters cannot be considered as producing any undesirable change to the character of the neighborhood and granting the variance will not create any detriment.
>
> The proposed use as a boutique hotel cannot be approved insofar as the facility does not meet the requirements for a hotel set forth in Chapter 277 of the Code of the City of Kingston nor does it meet requirements set forth for such facilities in the New York State Building Code;
>
> NOW, based on the above findings of fact, it is hereby
>
> RESOLVED, that the requested use and area variances are granted as herein modified.
>
> The applicant is granted a use variance to operate a boarding home in accordance with the special permit provisions applicable in an R-2 zone, on such terms and conditions as approved by the Planning Board.
>
> The applicant is further granted a variance from such requirements set forth in section 405-12(B)(2) and section 405-12(aa), as deemed appropriate by the Planning Board in its consideration and determination regarding the application for a special permit.

submitted an application to the Planning Board for a Special Use Permit and Site Plan Approval. (Dkt. No. 19-42, at 2). Chestnut Hill stated that it was seeking to operate "a 39 bed Boarding Home providing room and board and temporary shelter services to residents of the community." (*Id.* at 5). Chestnut Hill sought a "variance/waiver" of code provisions "limiting borders to 12 and rooms to 10," "limiting rooms to 2 occupants," and "barring 3rd floor occupancy." (*Id.*). Counsel for Chestnut Hill explained that "limitations on size make the premises financially not viable." (*Id.* at 2). Chestnut Hill also sought a waiver of the requirement that "the operator . . . keep a register of residents subject to Police, Fire Department and Building Department Inspection upon demand," explaining that "a register open to public scrutiny denies these vulnerable residents their privacy and will discourage them from benefitting from applicant's housing." (*Id.*). On April 15, 2019, the Planning Board granted Chestnut Hill's application and issued an annually renewable Special Use Permit and Site Plan Approval, enabling Chestnut Hill to operate legally.[10] (Dkt. No. 19-43). On September 5, 2019, *Chestnut Hill I* was dismissed by reason of settlement. *Chestnut Hill I*, Dkt. No. 74. The Special Use Permit was renewed annually, and "without difficulty," in 2020, 2021, and 2022. (Dkt. No. 1, ¶ 37). On July 17, 2023, the Planning Board denied Chestnut Hill's 2023 application to renew the Special Use Permit. (*Id.* ¶ 46).

---

(Dkt. No. 19-41, at 2–3).

[10] The Planning Board resolution that granted the Special Use Permit "imposed a variety of conditions including regular inspections at a minimum of once per year for permit renewal, and occupancy limits in compliance with State Building Codes including the Multiple Dwelling Code." (Dkt. No. 1, ¶ 35; Dkt. No. 19-41). The resolution further stated that the conditions "upon renewal may be expanded on after consideration by the Board and with cause," including that the owner reside in the City of Kingston, occupancy limits comply with all codes and local rules, there be no portable heating units, all cooking and food must be in the kitchen and in no other room, the owner must provide and change linens weekly, garbage must be deposited in suitable covered receptacles, all sleeping rooms be numbered, every floor be equipped with a fire extinguisher, inspections by the Building Department be conducted once per year and additional inspections may be required, and "[s]aid use shall conform and be maintained in harmony with the overall character and appearance of the surrounding neighborhood." (Dkt. No. 19-43, at 4).

**B.      Events Leading to the July 17, 2023 Denial of Special Use Permit**

On October 20, 2021, following an annual inspection, Stephan Knox, the Code

Enforcement/Building Safety Officer for the City of Kingston issued a Violation Notice and

Order to Remedy directing Chestnut Hill to, inter alia, to install and mount carbon monoxide

detectors, provide fire extinguishers for two rooms, and install a smoke detector and carbon

monoxide detector in the basement. (Dkt. No. 19-24, at 2). In addition, Knox advised

Sangiovanni that: "NYS now requires that Fire Escapes are examined for structural adequacy

and safety in accordance with NYS 1104.16.5.1"[11] and that "[t]his office has not received an

Inspection report certifying the Fire Escape." (*Id.*).

Sangiovanni called the Building Department to request "names of engineers that . . .

inspect fire escapes." (T. 57).[12] An assistant building inspector placed Sangiovanni in contact

with John Stinemire, P.E., a consulting engineer. (T. 58–59). On November 4, 2021, Stinemire

conducted a "condition inspection of the exterior steel fire escape at 106 West Chestnut Street."

(Dkt. No. 19-25, at 2–3). In a letter dated November 4, 2021, Stinemire made the following

findings and recommendations with respect to the fire escape: a tread had "been partially cut

compromising its integrity"; the foundations for "several of the steel angle supports" were "set

below grade" and thus not only prohibited visual inspection but should not "be in direct contact

with the soil as the steel will corrode and eventually fail"; a "concrete foundation pier" had

"deteriorated to [sic] point where it is not structurally sound" and required a new concrete pier

---

[11] The New York State Uniform Fire Prevention and Building Code states that the "2020 Fire Code of New York State" is published by the International Code Council, Inc. 19 NY ADC § 1219.2(a)(3). Section 1104.16.5.1 states: "Fire escape *stairways* and balconies shall be examined for structural adequacy and safety in accordance with Section 1104.16.5 by a registered design professional or others acceptable to the *fire code official* every 5 years, or as required by the fire code official. An inspection report shall be submitted to the *fire code official* after such examination." https://codes.iccsafe.org/content/NYSFC2020P1/chapter-11-construction-requirements-for-existing-buildings#NYSFC2020P1_Pt03_Ch11_Sec1105 (last visited October 13, 2023).

[12] The Court refers to the September 20, 2023 evidentiary hearing transcript, (Dkt. No. 40), as "T."

that extended four feet "below grade for frost protection"; a "diagonal steel bracing member" had been "cut and removed" and "should be replaced with new members of equal size and welded in place." (*Id.*). In closing, Stinemire stated: "This is a condition inspection only and does not include any comments, representations or conclusion regarding the design, analysis, load capacity or overall design or suitability of the subject fire escapes." (*Id.* at 3).

Sangiovanni "immediately started" making the repairs Stinemire had recommended. (T. 59). However, due to "the weather and the cold," Sangiovanni was unable to pour the concrete required to repair the fire escape "footing[] that had rotted away." (T. 60). Sangiovanni contacted Knox and told him that he had begun the repairs but that he could not repair the footing until the weather was better. (*Id.*). Knox advised Sangiovanni to "get a building permit," which would give him a year to complete the repairs. (*Id.*). Sangiovanni obtained a building permit with an expiration of April 2023. (*Id.*).

On February 22, 2022, the City of Kingston Planning Board considered and approved Chestnut Hill's annual application to renew its Special Use Permit. (Dkt. No. 19-26, at 2). The meeting minutes reflect that a board member asked Sangiovanni about "outstanding building permits and the Building Safety Inspection," and that Sangiovanni responded "that there are still some minor items to be addressed with the fire escape but that those cannot be done until the better weather." (*Id.*). In voting to approve the Special Use Permit, the Planning Board directed that all original conditions carry forward and that there be "follow up by the Building Department to inspect outstanding permits and sign off on the fire escape." (*Id.*).

On or about January 23, 2023, Chestnut Hill received a letter from the Planning Board stating that the Special Use Permit would expire on February 22, 2023, and that an application was due by February 1. (Dkt. No. 1, ¶ 37; Dkt. No. 19-44). Sangiovanni requested and received

an extension and timely filed the application before the March 20, 2023 Planning Board meeting.

(Dkt. No. 1, ¶ 38; *see* Dkt. No. 19-40, ¶ 13 ("The Planning Board received Chestnut Hill's

renewal application on February 22, 2023, and added it to its agenda for its March 20, 2023

meeting.") (internal citations omitted); Dkt. No. 19-46 (application)).

On March 20, 2023, the Planning Board "opened the floor for a public hearing." (Dkt.

No. 1, ¶ 39).[13] Six individuals addressed the Planning Board:

> The first speaker complained about the Planning Board's failure to push "the applicant's . . . curfew back an hour from 11 pm to 10 pm in order to afford us an extra hour of quiet at bedtime" "[a]fter hearing about all the noise and comings and goings." He complained that Chestnut Hill was not "living up to what's been depicted in his program outline and it is a problem for us. No doubt it is a problem for his guests." (Dkt. No. 19-11, at 3–4). The speaker accused the Planning Board of excusing the Chestnut Hill from the "requirements of rooming and boarding legislation that are there to protect us all of us." (*Id.* at 4). "This legislation was enacted to protect the residents of rooming and boarding houses and mitigate the establishment's ill effects on the surrounding neighborhoods. Either deny the permit or allow the rooming and boarding legislation in total to do its job." (*Id.*).

> The  second speaker stated that she had "no objection to the boarding house" but she did object to "the manner in which it's operated." She explained that she had "compassion for the residents and I know they are in need of housing and services," and that even though she had heard "there's a housing and mental health crisis in our city," the "boarding house provides housing and that seems to be it." (*Id.* at 5). She asked why the boarding house was "able to operate without abiding by the laws and regulations of Kingston?" (*Id.*). The second speaker explained that although the boarding house website stated that it was "a clean and sober living environment" and that "routine alcohol and drug testing will be done to be certain that none of these negative activities occur on our property," neighbors had found "syringes and empty alcohol contains on their properties as well as litter and bottles along the sidewalk." (*Id.* at 6). She asked whether there were "annual inspections" by the Building Safety Department, whether there were entrances to accommodate the

---

[13] Plaintiffs assert they received no notice that there would be a public hearing at the March 20, 2023 Planning Board meeting. (Dkt. No. 1, ¶ 39). However, it is undisputed that Sangiovanni attended and spoke at the hearing.

physically disabled who may be living there, whether there was a fire escape on the third floor, adequate sanitation, whether occupancy limits were being adhered to noting there were rumors of "tight living quarters." The second speaker told the Planning Board of her alarm that someone had died of an overdose at the house within the past week and concern for the safety of the boarders and whether they were receiving the services that they needed. (*Id.* at 6–7).

The third speaker stated that she opposed renewal of the Special Use permit. (*Id.*). She stated that the operation of the boarding house was inconsistent with the zoning code, that she hoped Chestnut Hill could "be brought into compliance with the zoning code" but was not optimistic and requested a plan "to start reducing capacity through attrition and working with social services to assist additional residents to find appropriate housing. (*Id.* at 8).

The fourth speaker, who lived in the Chestnut Hill neighborhood, told the Planning Board she had seen "several people come out of there not being able to stand" and "waddle and struggle they are definitely intoxicated or on drugs," that a neighbor had found a resident "sleeping in their car," that she had been told a "registered sex offender" had been living there and would wait for the children to exit the Kingston High School, and that she was concerned for her future grandchild who would be living in the neighborhood. (*Id.* at 9–10). She concluded by stating that she was not "against [it] being a boarding house," she was "just saying that the rules and regulations should be followed through." (*Id.* at 10).

The fifth speaker stated that that "based on what [he had] read, the population in that house far exceeds anything that is written down by code." (*Id.* at 11). He stated that he had a house on West Chestnut Street that he had "rented out for years" but that if had "broke the code," he "would be looked at, fined." (*Id.*). The fifth speaker, who was married to the fourth speaker, reiterated his concern for his grandchild and asked the Planning Board members to picture themselves "living in the neighborhood" and "saying this is okay." (*Id.*).

The sixth speaker stated that her neighborhood was "becoming victim to what's going on" and "feeling somewhat trapped about this house being where it is." (*Id.* at 13). The sixth speaker stated that there "were no problems" in the past, and that the community "somewhat embraced some of the . . . constituents that used to live in that house who had disadvantages in life and it was okay," but that presently, "it's not okay." (*Id.*). She explained that they are

11

seeing "syringes and other . . . disgusting garbage in our yards" and things being taken from "outside of our homes." (*Id.* at 13–14). The sixth speaker spoke of residents of the neighborhood installing "ring doorbells" because of a fear that "someone could come . . . near our homes." (*Id.* at 14). She stated that "this is not how it was a year ago or even two years ago." (*Id.*). She acknowledged that the parking concerns had been resolved but requested that something be done "to make it feel like a safer neighborhood as it was." (*Id.*).

(Dkt. No. 19-11, at 3–14). Sangiovanni told the Planning Board that he knew "none of these people" and that "[n]one of them have called [him]" or "spoken to [him] about anything going on in the house that they're concerned" about. (*Id.* at 15).

Suzanne Cahill, the Planning Director of the City of Kingston and Planning Board member, noted Chestnut Hill's building inspection was "coming up very shortly" and that the Board would "wait to hear the results." (Dkt. No. 19-11, at 17). Cahill also stated that she had spoken with the police chief to discuss "the events of this past weekend," namely the death at Chestnut Hill, and that the police chief informed her it was due to an overdose. (*Id.* at 17). Cahill observed that overdoses "happen . . . in every neighborhood." (*Id.* at 18).[14] Cahill stated that she also talked to the police chief about "the number of calls and the types of calls" over the past year, from neighbors, from Sangiovanni, and from "other individuals in the home" and that she had "a couple questions." (*Id.*). Cahill asked who the resident manager of Chestnut Hill was and Sangiovanni confirmed that the manager lived at the property. (*Id.* at 18). Cahill noted that the Chestnut Hill "rules" Sangiovanni gives to each resident state that residents are subject to "routine [drug] testing" and asked how the routine testing was performed. (*Id.* at 18–19). Sangiovanni responded that "we do it when we feel it's necessary." (*Id.* at 19).

---

[14] In an affidavit, the Planning Board Chair Walter Platte stated that Sangiovanni asserted at the meeting that the "death was the result of a cardiac arrest." (Dkt. No. 19-40, ¶ 18). Sangiovanni's assertion is not audible on the video.

Board Member Robert Jacobsen asked whether the "fire escape[]" issue had been addressed. (Dkt. No. 19-11, at 20–21). Cahill stated that the Board did not have evidence that the work that had been done the previous year was complete but hoped that "the building department will confirm" that it had been completed. (*Id.* at 21). Sangiovanni explained that he had hired a structural engineer to review the safety of the structure and that the engineer's report had been "turned . . . in to" the City Building Department, and that "routine maintenance problems" had been identified, but "[a]bsolutely nothing structural" had been found. (*Id.* at 21 (referring to November 4, 2021 Stinemire letter)).[15] The Planning Board tabled Chestnut Hill's application pending the building inspection. (*Id.* at 23).

On March 22, 2023, Knox inspected Chestnut Hill "for international property maintenance compliance, as was the practice for all rental dwellings." (Dkt. No. 1, ¶ 41). On April 12, 2023, Knox issued a Violation Notice:

- Fire escape repairs have been made but a follow up inspection by the engineer must be conducted and a final approval letter forwarded to Building Safety.

- Fire alarm system must be tested and inspected by a qualified alarm system company and their report forwarded to Building Safety

- Bedroom in basement cannot be used until a permit has been obtained, space complies with applicable building codes, and a certificate of occupancy is issued for the space.

- One bed must be removed from the rear cottage left side bedroom to comply with the code for occupant spacing requirements.

---

[15] Platte stated in his affidavit that "the Planning Board noted that it had not yet received a structural adequacy and safety report for a fire escape on the exterior of the building, as required by § 1104.16.5.1 of the New York State Fire Code." (Dkt. No. 19-40, ¶ 17). The meeting transcript reflects discussion of the fire escape inspection and structural review by an engineer, (Dkt. No. 19-11, at 21), but does not reflect a specific reference to the Fire Code. However, much of that portion of the meeting was recounted as "unintelligible," (Dkt. No. 19-11, at 20), and there is no dispute that the requirement was discussed during the March 20, 2023 meeting.

(Dkt. No. 19-29, at 2). Knox advised Sangiovanni that the permit "for the deck and front porch expires 4/13/2023 and must be extended immediately" and that the "permit for repairs to the fire escape can be closed at as soon as we receive the letter from your engineer." (*Id.*). The Violation Notice and Order to Remedy also advised of the "following issues noted by the Housing Inspector":

> 3rd floor restroom floor tile needs repair. Fire extinguishers throughout the building (purchased at big box store) are un-tagged, particularly the extinguishers in the kitchen area had tags that indicated they expired in 2017. Room 8 had 4 beds. Room 7 had 5 beds. Room 7 electrical outlet needed to be tightened flush to the wall. Hallways/stairways had some holes in the plaster walls that required patching/repair. 2nd floor foyer area held non-functional exit sign which required repair or replacement. 2nd floor restroom #1 window was "painted shut." Needs to be openable. 2nd floor restroom #2 electrical outlet needed a cover. Basement bedroom egress window had sheetrock placed over it, needs to be uncovered and usable as emergency exit/means of egress. Accessory dwelling/cottage in the back of the main building had an extra bed in the main bedroom. Report needed for Fire alarm system and report needed from engineer for the fire escape repairs. Stone wall column unfinished, doesn't appear proper length of set back from the road/sidewalk. Finishing touches/work needed on front porch. Please pull proper permits where required.

(*Id*. at 3). It is not disputed that with the exception of the "report . . . from engineer for the fire escape repairs" the above issues were resolved.

Building Safety reinspected Chestnut Hill on April 17, prior to the next Planning Board meeting and Knox notified the Planning Board via email that:

> All of the smaller items have been corrected and the beds we required be removed in the rear cottage and basement were gone. The fire alarm system, which was not required at the time of construction, is not working. The pull stations and strobes will temporarily be covered until Fisher Alarms restores the system to full working order. The fire escape repairs have been made and John Stinemire will be there April 25 . . . to do his follow-up inspection. All smoke and carbon monoxide detectors are operational. With the

removal of the basement beds there were 39 total beds in the buildings.

I am willing to issue a 30–45 day operating permit at this point.

(Dkt. No. 19-50, at 2).

At the April 17, 2023 Planning Board meeting, the Board noted "that several items indicated by Building Safety during its March 22, 2023, inspection had still not been addressed." (Dkt. No. 19-40, ¶ 25). Specifically, the Planning Board noted that the report provided by Building Safety indicated that "the fire alarm system had not yet been either removed or restored to working order and that the required engineering report regarding the condition of the fire escape still had not been submitted." (*Id.*). Cahill explained that the structural engineer was scheduled to inspect the fire escape on April 25, before the Board's next meeting. (Dkt. No. 19-12, at 7). Chestnut Hill's application was again tabled until the next Planning Board meeting. (Dkt. No. 19-40, ¶ 26).

On April 26, 2023, Stinemire conducted a follow-up inspection of the "exterior steel fire escape" at Chestnut Hill but did not issue a report until May 24, 2023. (Dkt. No. 1, ¶ 42; Dkt. No. 19-32, at 2).

On May 15, 2023, Knox sent an email updating Cahill and Assistant Corporation Counsel Jankowski with respect to Chestnut Hill. (Dkt. No. 19-51, at 2). Knox wrote that although "John Stinemire, engineer" was "scheduled to conduct a follow-up inspection of repairs made to the fire escape on April 25th . . . [n]o report has been submitted to Building Safety to date." (*Id.*). Knox noted that Sangiovanni had provided "the required inspection report from Fischer Alarms repairs to the house alarm system." (*Id.*). In the email, Knox also recounted a recent incident at Chestnut Hill:

> On Saturday, May 13, 2023, [the Kingston Fire Department]
> responded to a complaint at 106 W. Chestnut for bags of laundry
> blocking the basement egress. They also found an electric stove in a
> basement closet being used to treat items for bed bugs. Building
> Safety was asked to follow-up today.
>
> During our inspection today, the bags of laundry were removed and
> the basement egress was clear. The stove was still in the basement
> but the wiring circuit has been cut making it useless. We have asked
> them to move the stove completely.

(*Id.*). Knox acknowledged that "[t]he last remaining item required by Building Safety is the fire

escape stair inspection report." (*Id.*).[16]

The Planning Board met again on May 15, 2023; both Sangiovanni and his attorney,

Lanny Walter, attended the meeting. (Dkt. No. 19-13, at 2). Chair Platte stated that the Planning

Board began by identifying the "items that needed to be addressed before we could move

forward with an approval or a renewal," including "a structural engineering report to sign off on

the fire escape," evidence that "the fire alarm system was functioning or removed," a "question

of some beds being removed from the premises," "including one in the cottage and those in the

basement." (*Id.* at 3). Chair Platte also noted the Planning Board's receipt of Knox's May 15,

2023 email and read it into the record. (*Id.* at 3–5).

Attorney Walter reported that he had called Stinemire's office on May 12 and 15 but that

they were still waiting for the fire escape report. (Dkt. No. 19-13, at 6). Cahill acknowledged that

both Sangiovanni and Building Safety had informed the Planning Board that the repairs "needed

to be made in order for [the fire escape] to be considered structurally sound" "were done," but

explained that Building Safety wanted "the structural engineer [to certify] that . . . those repairs .

. . are structurally sufficient" because Building Safety did not "have the professional expertise to

---

[16] Knox noted that Chestnut Hill's "operating permit expired 8/20/2019 and due to legal matters, covid and outstanding violations, his properties [sic] operating permit status remains out of date." (Dkt. No. 19-51, at 2). The operating permit appeared to play little, if any role, in the Planning Board's decision to deny Plaintiffs' renewal application.

certify." (*Id.* at 11). Sangiovanni responded that if, during his inspection, Stinemire "felt that [the

fire escape] wasn't structurally sound . . . he would have immediately issued a report saying that"

and asked for documentation supporting the legality of the Planning Board's request for a report

by an engineer regarding the fire escape. (*Id.* at 11–12). Chair Platte explained to Sangiovanni

that the Planning Board's request for documentation from a structural engineer was not unique to

Chestnut Hill and that while he could not "list them," whenever an applicant "come[s] through"

with a fire escape, the Planning Board "need[s] to know" it "is sound." (*Id.* at 12).

Prior to tabling Plaintiffs' renewal application for the third time, Chair Platte told

Sangiovanni and Attorney Walter that if, as Sangiovanni represented, Plaintiffs had provided the

Planning Board with the report showing the fire alarm system was operational, written

confirmation that all the items in the original approval were being followed, the name and

contact information of the site manager, and confirmation of maximum occupancy, "really the

only outstanding issue would be the fire escape." (*Id.* at 24–27).

On or about May 24, 2023, Stinemire provided a letter to Sangiovanni concerning his

April 26, 2023 inspection of the fire escape. (Dkt. No. 19-32, at 2). Stinemire identified several

items in need of repair: a "diagonal bracing member" required replacement; a horizontal railing

was not securely fastened and needed to be attached; and wood blocking needed to be installed

"to allow for a secure connection." (*Id.*). Stinemire further stated:

> This report is based on a field inspection of the subject fire escape
> only and represents the observation of conditions found at the time
> of inspection. Areas that were concealed or inaccessible at the time
> of inspection and that could not be visually observed are not covered
> as part of this inspection.  This is a condition inspection only and
> does not include any comments, representations or conclusions
> regarding the design, analysis, load capacity, or overall design and
> suitability of the subject fire escape.

(*Id.*).

On or about May 30, 2023, Attorney Walter, on behalf of Chestnut Hill, sent Chair Platte a copy of Stinemire's reports and pictures and stated that the "two remaining issues with the steel fire escape" identified by Stinemire in his May 24 report "have been remedied." (Dkt. No. 19-53, at 2). Attorney Walter represented that both issues were "routine maintenance items that do not jeopardize the integrity of the fire escape and pose no danger to anyone." (*Id.*). Attorney Walter further stated that Chestnut Hill "remains in compliance with the conditions set in the Resolution dated April 16, 2019 approving the Site Plan/Special Permit," attached a copy of the "form agreement" each resident signs "notifying the resident of the terms governing the occupancy," provided the name and contact information for the on-site manager, and stated that the stove had been disabled. (*Id.* at 2–3).

In a letter to Knox dated June 5, 2023, Attorney Walter wrote that after Sangiovanni "boarded up the bedroom in the basement," one of the residents had "set up camp in the basement" with "a make shift bed which now includes a hammock hanging in front of the Exit door." (Dkt. No. 19-33, at 2). Attorney Walter reported that Sangiovanni had told the resident "to depart" and had "asked for [Knox's] assistance and that of the police" but they had "failed to act." (*Id.*). Attorney Walter requested that Knox "proceed to remove him with the help of police if need be." (*Id.*). In a letter to Knox dated June 9, 2023, Attorney Walter indicated that the resident was still in the basement and asked Knox to "[p]lease get him removed." (Dkt. No. 19-34, at 2).[17]

At the June 20, 2023 Planning Board meeting, Sangiovanni advised that his attorney was sick and requested that consideration of Chestnut Hill's renewal application be postponed. (Dkt.

---

[17] In an affidavit, Knox states that his department "is not empowered to forcibly evict tenants, who may have additional rights under New York law" and that he "could not comply with this request." (Dkt. No. 19-22, ¶ 26).

No. 19-40, ¶ 41). The Planning Board granted the request and tabled the renewal application for the fourth time. (*Id.*).

On July 14, 2023, Knox, at Sangiovanni's request, again inspected Chestnut Hill. (Dkt. No. 19-55, at 2). In his report, Knox noted that with respect to the fire escape, the "cross bracing" had been repaired and secured, the "[t]op landing railing secured to house wall with bolts," and the "[b]ottom step" had been repaired." (*Id.*). Knox also wrote:

> Mr. Sangi was informed that I noted that the repairs have been made, but the NYS licensed design professional (engineer) still needed to submit a letter stating the fire escape is structurally sound (NYS FC 1104.16.5.1 – attached).  Mr. Sangi continues to contend that a follow-up letter from the engineer is not required.

(*Id.*).

A Planning Board meeting was scheduled for July 17, 2023. (Dkt. No. 1, ¶ 44). Prior to the meeting, Attorney Walter submitted a letter stating that "a second follow-up report" had been sought from Stinemire but that it "was not generated" and that "no one who had inspected the fire escape recommended that its use be discontinued." (*Id.* ¶ 45).

At the July 17, 2023, meeting, the Planning Board noted its receipt of Attorney Walter's July 17, 2023 letter and indicated that it would be included in the record. (Dkt. No. 19-14, at 3–4). Chair Platte observed that there had been an "unfortunate incident" at Chestnut Hill the previous week—two individuals had overdosed, one of whom had died. (*Id.* at 4). Chair Platte stated that the Planning Board had given Chestnut Hill "different approvals . . . over the years" but that there did not "necessarily seem that there's proper oversight" by "the manager for the day-to-day operations for the population that it serves there." (*Id.*). When Sangiovanni asked "[h]ow's that?," Chair Platte responded that "we have a number of incidents like this happening, you know, unfortunately last week." (*Id.* at 5). Chair Platte further stated that there had "been the

police reports that have been generated for this particular . . . property" and that had been "numerous over the years." (*Id.*).

For the next thirty minutes of the meeting, Chair Platte, Cahill, and Corporation Counsel Jankowski argued with Sangiovanni and Attorney Walter regarding: Chestnut Hill's failure to provide "a report from an engineer certifying" the structural soundness of the fire escape; whether the fire escape repairs Stinemire had identified as necessary in his November 4, 2021 and May 24, 2023 letters had been made; whether Stinemire's letters, which Sangiovanni pointed out never indicated that the fire escape was *not* structurally sound, were sufficient to satisfy the provision of the Fire Code requiring a structural soundness certification from an engineer; whether Chestnut Hill's fire alarm system, which Sangiovanni had recently had activated, was required to be operational; whether the Planning Board had, as Chair Platte asserted, identified the fire alarm system as an issue three years ago, or whether, as Sangiovanni asserted, it was only recently identified; and whether, as Chair Platte asserted, Chestnut Hill had consistently "disregard[ed] . . . the parameters that have been prescribed in the special permits" with respect to the "a number of beds." (*Id.* at 5–37).

Following these arguments, Chair Platte asked the Planning Board members if they agreed "that we should deny based on what we've talked about tonight and at previous meetings with compliance issues." (*Id.* at 29). Board member Robert Jacobsen commented that the Planning Board had "been going round and round on this, but generally speaking they have made an attempt to correct some of these items, although it's taken some time." (*Id.*). Chair Platte then moved to deny renewal of the special permit. (*Id.* at 37). The Planning Board passed the motion denying renewal: four board members voted "yes" and one board member voted "no." (*Id.* at 44–45).

The resolution provided, in relevant part:

> Whereas, violations were cited by the Department of Building, Safety, and Zoning in 2021 ordering corrective action by July 26, 2021, and additional violations were cited on October 20, 2021, May 10, 2022, April 12, 2023.

> Whereas, the violation of fire safety requirement 704.1 cited on the 10/20/2021 violation notice was not remedied until May 1, 2023 leaving the fire alarm notification system to remain inoperable during that time period; and

> Whereas, after inspection by the Building Department for the current renewal, violations were cited by the Building & Safety Department on April 12, 2023 and the number of residents in the carriage house was to be decreased; and

> Whereas, on October 20, 2021 and again on April 12, 2023 violations were cited of NYS 1104.16.5.1, pertaining to the exterior metal fire escape used as a primary means of resident ingress and egress; and

> Whereas on April 26, 2023 an engineer hired by applicant conducted a condition inspection of the exterior steel fire escape, which is used by residents as a regular means of ingress and egress; and

> Whereas, the engineer's letter to the applicant, dated May 24, 2023, reports that "One of the diagonal bracing components for the fire escape has been cut 90% through the member. This bracing member will need to be removed and replaced with a member of the same size and shape." And "One horizontal railing component at the upper-level landing is not securely fastened to the building. All railing components need to be securely attached so that they do not move. Wood blocking needs to be installed in the exterior to allow for a secure connection."; and

> Whereas the engineer indicated that the letter "is a condition inspection only and does not include any comments, representations or conclusions regarding the design, analysis, load capacity, or overall design and suitability of the subject fire escape"; and

> Whereas, on May 30, 2023, applicant sent photographs showing repairs to the exterior steel fire escape but has not submitted any report from an engineer, or qualified professional, addressing the structural adequacy, safety, and load bearing capacity of the exterior

> steel fire escape, in compliance with the Unifor Fire Safety and Building Code; and
>
> Whereas, in June 2023 applicant reported that a resident is sleeping in the basement and blocking the basement fire escape in violation of the building code and the violation was confirmed by the building department; and
>
> Whereas, repeated and recurring issues have continued which include issues of public safety, such as the fire escape condition and maintenance, the fire alarm system not being fully operational at all times, obstacles and debris collecting in egress pathways; and
>
> Whereas, the Planning Board has determined that the conditions set forth in the permit have not been complied with and, pursuant to section 405-32(D), a period of more than 60 days was given the application to bring the property into full compliance.

(Dkt. No. 19-57, at 3-4). In an affidavit, Chair Platte further explained:

> During the preceding six months, Chestnut Hill had continuously and consistently shown disregard for the parameters of its special use permit. Furthermore, it was my belief that after nearly six months of repeated requests for the safety report, it was unlikely that Chestnut Hill would take the steps necessary to ensure that all of the conditions specified in the previously issued special use permit were satisfied in a consistent manner or that residents and the surrounding community would not continue to face unusually high levels of police-involved emergencies. I therefore motioned for a vote on its renewal request.

(Dkt. No. 19-40, ¶ 47). According to Chair Platte: "If Chestnut Hill decides to seek a new special use permit, it will need to comply with the requirements of Kingston's new form-based zoning code, which went into effect on August 2, 2023." (*Id.* ¶ 49).

## C.    Post-Denial Events

In a letter to Corporation Counsel dated July 18, 2023, Attorney Walter recounted Chestnut Hill's prior litigation against the City of Kingston, the TRO, and the administrative process leading "in 2019 to a settlement which granted the Boarding Home on April 16, 2019 and Special Permit and Site Plan approval." (Dkt. No. 19-3, at 2). Attorney Walter requested a

meeting to resolve the matter, and informed Corporation Counsel that "a reasonable accommodation is sought under both the FHA and the ADA that allows the Group Home to continue to operate." (*Id.*).

In a letter to Attorney Walter, dated July 20, 2023, Assistant Corporation Counsel Jankowski responded that "Mayor Noble has repeatedly affirmed his commitment to improving housing stability for all of Kingston's residents, particularly community members in dire need of secure affordable housing options." (Dkt. No. 19-4, at 2). Jankowski indicated that the "City of Kingston is not looking to put any of the vulnerable residents of your boarding house out on the street without first working with the County and our nonprofit partners to help those individuals secure safe and supportive housing accommodations." (*Id.*). Jankowski further stated: "Although you are displeased by the denial of your client's application for the renewal of its special permit for a boarding house, the decision resulted from a lack of providing the information necessary for the Planning Board to carry out this duty." (*Id.*). Jankowski also outlined the requirements Chestnut Hill would have to satisfy should it seek to file a new application for a Special Permit, including an "inspection report, by a registered design professional, confirming the structural adequacy and safety of the exterior fire escape stairs"; proof that all fire alarm systems are being maintained in an operable condition, and certificates of occupancy for all areas of the residence. (*Id.* at 3).

In a letter to Attorney Walter dated August 18, 2023, Corporation Counsel Barbara Graves-Poller wrote: "As you know, the City of Kingston's Planning Board denied your client's application for a new special permit on July 17, 2023. And as stated in our previous correspondence, the City must balance its commitment to community members in dire need of housing with its duty to ensure that all housing accommodations remain safe and Code-

compliant." (Dkt. No. 19-5, at 2). Graves-Poller therefore requested Plaintiffs' cooperation in "identifying current residents," by providing a list within two business days so that the City of Kingston could "apprise affected individuals of the property's status" and connect residents with City-funded resources available through the United Way of Ulster County. (*Id.*). Finally, Graves-Poller advised that because Plaintiffs were "unlawfully operating a boarding house with previously identified safety hazards, no new residents should be allowed to move into the building" and urged Plaintiffs "to prevent current occupants from using windows or parts of the building other than the front and rear doors as means of ingress and egress." (*Id.* at 3).

On August 14, 2023, Stinemire, after another inspection, issued a third report stating "Generally, the steel fire escape was found to be structurally sound at the time of my inspection." (Dkt. No. 5-5, at 6). In a letter to Graves-Poller dated August 18, 2023, Attorney Walter stated that Sangiovanni had already "completely addressed" the requirement that he provide "proof of adequate fire protection," (Dkt. No. 19-6, at 2); that Stinemire had issued a report regarding the fire escape, and attached a copy, (*id.*); and that the City had not requested a certificate of occupancy since April 2019, and that Plaintiffs would have applied for one had it been sought by Code Enforcement, (*id.*). Attorney Walter requested a meeting to "explore the reasonable accommodations the City will allow and prohibit any threat to evict the residents until these discussions are held." (*Id.*).

### D.    Complaints to Alderwoman Hirsch

In an affidavit, Michele Hirsch, an Alderwoman representing the City of Kingston's Ward Nine, which encompassed Chestnut Hill, and a member of the City of Kingston Common Council, states she is "called upon almost daily," by telephone and email, "to respond to various constituent issues from renters and property owners within Ward Nine." (Dkt. No. 19-15, ¶¶ 1–2, 7). After receiving complaints, Alderwoman Hirsch generally contacts the responsible

department head at City Hall to gather information or refers concerns to the Common Council's

Public Safety & General Government Committee. (*Id.* ¶¶ 9–10).

Alderwoman Hirsch states that to her knowledge, there are two boarding houses in her

ward: Chestnut Hill and 356 Broadway. (Dkt. No. 19-15, ¶ 11). Since taking office in January

2020, Alderwoman Hirsch has "never received a single complaint about" 356 Broadway from

any of her constituents. (*Id.* ¶ 11). Alderwoman Hirsch has "received a multitude of constituent

complaints regarding the operation of Chestnut Hill and the potential safety issues for its

residents," including: the absence of any outside staff to provide services or consistently

supervise residents; the building's apparent lack of ADA accessibility "notwithstanding the

presence of residents with readily apparent mobility impairments"; the escalation of problems at

the house "as overdoses and deaths become more frequent"; the presence of residents who

appear to have "higher level psychiatric needs that require regulated supportive housing"; reports

that Chestnut Hill residents were "leaving bags of garbage in the neighborhood; and reports of

syringes tossed into backyards adjoining" Chestnut Hill. (*Id.* ¶¶ 19–25). During the COVID-19

pandemic, the complaints Alderwoman Hirsch received concerned residents congregating in

"areas of the neighborhood" and leaving garbage. (T. 122). Alderwoman Hirsch testified that

during fall 2022, she received constituent complaints of trespassing and subsequently learned

from the police department that it was an individual who lived at 106 West Chestnut Street. (T.

114–15). On March 17, 2023, Alderwoman Hirsch received a text from a constituent reporting a

rumor of a murder and unattended death at Chestnut Hill. (T. 115–16).

Alderwoman Hirsch testified that in May 2023, she arranged for a local legislator to

attend a meeting with approximately 15 people from the Chestnut Hill neighborhood. (T. 124).

Alderwoman Hirsch stated that the attendees asked whether Chestnut Hill was a clean and sober

living environment or a place that the county would pay for the residents to stay there," (*id.* at

124), and "why there was rampant drug use or police calls and what was going on and make sure

that people in that environment were safe." (T. 125). Alderwoman Hirsh stated that on July 13,

2023, she was advised that "two more overdoses and one fatality occurred at Chestnut Hill."

(Dkt. No. 19-15, ¶ 33). On or about August 26, 2023, Chestnut Hill neighbors informed

Alderwoman Hirsch that "an elderly man with a prosthetic leg was brought to Chestnut Hill and

had to be carried up the steep front steps while someone else carried in two wheelchairs," and

expressed their concern for this individual and the house's lack of ADA accessibility. (*Id.* ¶ 35).

Alderwoman Hirsch did not submit a statement to the Planning Board while the Chestnut Hill

renewal application was pending. (T. 118).

## III.   DISCUSSION

### A.   Standing

In their opposition, Defendants argue that Chestnut Hill, NY, Inc., lacks "associational or

organizational standing" to pursue FHA claims and that Sangiovanni "is not presumed to have

standing based solely on this position as an officer of a property-owning corporation." (Dkt. No.

19-1, at 26–27). The Second Circuit has found that "the denial of an entity's special use permit

application . . . is an injury sufficient in itself to confer standing." *Anderson Grp., LLC v. City of

Saratoga Springs*, 805 F.3d 34, 46 (2d Cir. 2015). Thus, Chestnut Hill, NY, Inc. as the owner of

106 Chestnut Street and applicant for the Special Use Permit at issue, has sufficiently alleged

standing. Further, there is no dispute that Plaintiffs John Doe #1, John Doe #2, and John Doe #3,

as Chestnut Hill residents whose eviction Defendants are seeking, have Article III standing.

However, Sangiovanni, does not appear to have standing in this action. As the property's legal

owner, Chestnut Hill, NY, Inc., is the entity that suffered the alleged injury directly. *Baker v.

Bzydra*, No. 3:18-cv-01792, 2019 WL 6619348, at *1, 2019 U.S. LEXIS 213486, at *5 (D.

Conn. Dec. 5, 2019) (finding the plaintiff, who was the "ex-president and owner" of CT 102 LLC, lacked standing to assert a Fourteenth Amendment violation stemming from an allegedly fraudulent hearing regarding a complaint filed against CT 102 LLC with the Connecticut Department of Motor Vehicles, explaining that "[t]o the extent the complaint alleges an injury at all, it alleges that the injury was incurred by CT 102 LLC, not Plaintiff"); *Costello v. Town of Huntington*, No. 14-cv-2061, 2015 WL 1396448, at *4, 2015 U.S. Dist. LEXIS 38059, at *10 (E.D.N.Y. Marc. 25, 2015) (finding the sole owner of a corporation lacked standing where "the rights that the Town allegedly infringed belong[ed] to" the corporation itself as the "owner of the [p]roperty" at issue and the complaint was "devoid of any allegations that the Town took action against [owner of the corporation] independently," instead alleging the individual plaintiff was "'injured only as a result of the injury to'" the corporation (quoting *Bingham v. Zolt*, 66 F.3d 553, 562 (2d Cir. 1995)).

Because Sangiovanni alleges he was "injured only a result of the injury to another," i.e., Chestnut Hill NY, Inc. and the John Doe Plaintiffs, *Bingham*, 66 F.3d at 562, he fails to allege "[i]njury in a 'personal and individual way,' as Article III requires," *Costello*, 2015 WL 1396448, at *4, 2015 U.S. Dist. LEXIS 38059, at *10 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 n.1 (1992)). *See also Caravella v. City of New York*, 79 F. App'x 452, 453 (2d Cir. 2003) (finding the plaintiff shareholder lacked standing to bring civil rights action under 42 U.S.C. § 1983 because "[t]he injuries to plaintiff as alleged were indirectly caused by harm to DVS and therefore are not 'distinct' from those of the corporation." (citing *Audio Odyssey, Ltd. v. Brenton First Nat'l Bank*, 245 F.3d 721, 729 (8th Cir. 2001)); *Harp v. Destefano*, No. 03-cv-977, 2007 WL 2869831, at *5, 2007 U.S. Dist. LEXIS 71360, at *14 (D. Conn. Sept. 27, 2007) ("As the complaint is drafted, any alleged harm to Harp—such as lost income—is purely

derivative from the injury to AECI due to his status as AECI's sole shareholder."). Thus, in responding to Defendants' motion to dismiss, Sangiovanni is directed to show cause why he should not be dismissed from this action for lack of standing. Accordingly, the Court proceeds to consider the motion for a TRO and preliminary injunction insofar as it brought by Chestnut Hill, NY, Inc. and the John Doe Plaintiffs.

### B.       Motion for a TRO and Preliminary Injunction

#### 1.       Standard of Review

Rule 65 of the Federal Rules of Civil Procedure governs the issuance of TROs and preliminary injunctions. In general, a party seeking a preliminary injunction must demonstrate: (1) a likelihood of irreparable injury in the absence of an injunction; (2) a likelihood of success on the merits or sufficiently serious questions going to the merits to make them fair ground for litigation and a balance of hardships tipping decidedly in the plaintiff's favor; (3) that the balance of hardships tips in the plaintiff's favor; and (4) that the public interest would not be disserved by the issuance of an injunction. *Benihana, Inc. v. Benihana of Tokyo, LLC*, 784 F.3d 887, 895 (2d Cir. 2015); *see also N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 883 F.3d 32, 37 (2d Cir. 2018). With respect to the second factor, Defendants contend that because Plaintiffs seek to enjoin government action—the Planning Board's denial of Plaintiffs' application to renew the special use permit and eviction of residents—the "sufficiently serious questions" standard is unavailable and Plaintiffs "must satisfy a 'more rigorous likelihood-of-success standard.'" (Dkt. No. 19-1, at 21 (quoting *Lebanon Valley Auto Racing Corp. v. Cuomo*, 478 F. Supp. 3d 389, 395 (N.D.N.Y. 2020))).[18] The Court agrees. As the Second Circuit has explained, a plaintiff cannot

---

[18] Plaintiffs did not reply to this contention. (*See generally* Dkt. No. 24).

rely on the "sufficiently-serious-questions"[19] standard "to challenge 'governmental action taken in the public interest pursuant to a statutory or regulatory scheme.'" *Otoe-Missouria*, 769 F.3d at 110 (quoting *Plaza Health Labs., Inc. v. Perales*, 878 F.2d 577, 580 (2d Cir. 1989)); *see also*, *e.g.*, *Step By Step, Inc. v. City of Ogdensburg*, 176 F. Supp. 3d 112, 122 (N.D.N.Y. 2016) (applying more rigorous likelihood-of-success standard to the plaintiffs' motion for a preliminary injunction requiring the defendant city to approve the plaintiffs' application to establish housing for people with disabilities as the plaintiffs were seeking "a preliminary injunction that will affect government action taken in the public interest pursuant to a statutory or regulatory scheme"). Thus, as Plaintiffs seek a preliminary injunction affecting the Planning Board's action taken in the public interest pursuant to, inter alia, State and City of Kingston codes, they must show a likelihood of success.

Generally, preliminary injunctions are prohibitory or mandatory. *N. Am. Soccer League*, 883 F.3d at 36. "Prohibitory injunctions maintain the status quo pending resolution of the case; mandatory injunctions alter it." *Id.* The "status quo . . . is[] 'the last actual, peaceable uncontested status which preceded the pending controversy.'" *Id.* at 37 (quoting *Mastrio v. Sebelius*, 768 F.3d 116, 120 (2d Cir. 2014) (per curiam)). A party seeking a mandatory injunction "must meet a heightened legal standard by showing 'a clear or substantial likelihood of success on the merits.'" *Id.* (quoting *N.Y. Civil Liberties Union v. N.Y.C. Transit Auth.*, 684 F.3d 286, 294 (2d Cir. 2012)). Here, the injunctive relief Plaintiffs seeks is prohibitory. The relief sought would maintain "the last actual, peaceable uncontested status" between the parties: Chestnut Hill would remain a boarding house and the John Doe Plaintiffs could continue to reside there. *See Doe v.*

---

[19] This is also known as the fair-ground-for-litigation standard. *Otoe-Missouria Tribe of Indians v. New York State Dep't of Fin. Servs.*, 769 F.3d 105, 110 (2d Cir. 2014)

*Vassar Coll.*, No. 19-cv-9601, 2019 WL 6222918, at *4, 2019 U.S. Dist. LEXIS 203418, at *12

(S.D.N.Y. Nov. 21, 2019) ("In the instant case, it appears that the status quo ante was the

moment before Plaintiff's suspension was imposed." (citing *Garcia v. Yonkers Sch. Dist.*, 561

F.3d 97, 107 (2d Cir. 2009))). Accordingly, Plaintiffs need only show a likelihood of success on

the merits.

**2.      Analysis**

**a.      Irreparable Harm**

A showing of irreparable harm is "the single most important prerequisite for the issuance

of a preliminary injunction." *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118

(2d Cir. 2009) (quoting *Rodriguez v. DeBuono*, 175 F.3d 227, 234 (2d Cir. 1999)); *see also Doe

v. Rensselaer Polytechnic Inst.*, No. 18-cv-1374, 2019 WL 181280, at *2, 2019 U.S. Dist. LEXIS

5396, at *4 (N.D.N.Y. Jan. 11, 2019). "Irreparable harm is 'injury that is neither remote nor

speculative, but actual and imminent and that cannot be remedied by an award of monetary

damages.'" *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 660 (2d Cir. 2015)

(quoting *Forest City Daly Hous., Inc. v. Town of N. Hempstead*, 175 F.3d 144, 153 (2d Cir.

1999)). "The relevant harm is the harm that (a) occurs to the parties' legal interests and

(b) cannot be remedied after a final adjudication, whether by damages or a permanent

injunction." *Salinger v. Colting*, 607 F.3d 68, 81 (2d Cir. 2010) (internal footnote omitted).

Plaintiffs John Doe #1, John Doe #2, and John Doe #3 are "qualified individual[s] with a

disability" and have lived at Chestnut Hill for three and four years respectively. (Dkt. No. 1, ¶¶

5–6). Without a temporary restraining order or preliminary injunction, Chestnut Hill and

Sangiovanni will no longer be able to provide housing to the disabled residents of 106 West

Chestnut Street and Defendants will evict the John Doe Plaintiffs from their home. Thus,

Plaintiffs have shown irreparable harm. *See Sinisgallo v. Town of Islip Hous. Auth.*, 865 F. Supp.

30

2d 307, 328 (E.D.N.Y. 2012) (finding evidence that the plaintiffs would be evicted and rendered homeless if the housing authority was not enjoined was sufficient to establish irreparable harm); *see also Step By Step, Inc. v. City of Ogdensburg*, 176 F. Supp. 3d 112, 135 (N.D.N.Y. 2016) ("The City's actions have deprived SBS of its ability to pursue its mission and to provide housing and services to its mentally ill clients and this denial constitutes irreparable harm.").

### b.     Likelihood of Success

"To establish a likelihood of success on the merits, a plaintiff must show that he is more likely than not to prevail on his claims, or, in other words, that the 'probability of prevailing is better than fifty percent.'" *Doe v. Vassar Coll.*, 2019 WL 6222918, at *7, 2019 U.S. Dist. LEXIS 203418, at *20 (quoting *BigStar Ent., Inc. v. Next Big Star, Inc.*, 105 F. Supp. 2d 185, 191 (S.D.N.Y. 2000)).

Plaintiffs bring their disability discrimination claims under the FHA and ADA and assert that Defendants have subjected them to intentional discrimination on the basis of disability, that Defendants' conduct disparately impacts disabled residents, and that Defendants have failed to provide a reasonable accommodation. (*See generally* Dkt. No. 5-5). Defendants respond that Plaintiffs have failed to show discriminatory animus or disparate treatment and that they have failed to request a reasonable accommodation. (*See generally* Dkt. No. 19-1).

The FHA makes it unlawful "[t]o discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap of" the buyer or renter or any person associated with that buyer or renter. 42 U.S.C. § 3604(f)(1). The ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. "Due to the similarities between" the FHA and ADA, courts consider intentional discrimination claims

under them "in tandem." *Tsombanidis v. W. Haven Fire Dep't*, 352 F.3d 565, 573 n.4 (2d Cir. 2003). Further, both the FHA and ADA "apply to municipal zoning decisions." *Forest City*, 175 F.3d at 151.

"To establish discrimination under either the [FHA] or the ADA, plaintiffs have three available theories: (1) intentional discrimination (disparate treatment); (2) disparate impact; and (3) failure to make a reasonable accommodation." *Tsombanidis*, 352 F.3d at 573. The Court considers "claims of intentional discrimination under the FHA [and ] the ADA . . . under the familiar *McDonnell Douglas Corp. v. Green*, 411 U.S. 792,  (1973), burden-shifting analysis established for employment discrimination cases." *Reg'l Econ. Cmty. Action Program, Inc. v. City of Middletown ("RECAP")*, 294 F.3d 35, 48–49 (2d Cir. 2002), *superseded by statute on other grounds as recognized in Anderson Grp., LLC v. City of Saratoga Springs*, 805 F.3d 34, 46 (2d Cir. 2015). "To establish *a prima facie* case of discrimination under the FHA and the ADA, the plaintiffs must present evidence that 'animus against the protected group was a significant factor in the position taken by the municipal decision-makers themselves or by those to whom the decision-makers were knowingly responsive.'" *Id.* at 49 (quoting *LeBlanc–Sternberg v. Fletcher*, 67 F.3d 412, 425 (2d Cir. 1995)). "If the plaintiffs make out a *prima facie* case, then the burden of production shifts to the defendants to provide a legitimate, nondiscriminatory reason for their decision." *RECAP*, 294 F.3d at 49. "If the defendants meet that burden," the burden returns to the plaintiffs, who "must then prove that the defendants intentionally discriminated against them on a prohibited ground." *Id*.

### i.      Intentional Discrimination

Plaintiffs claim that Defendants subjected them to intentional, disability-based, discrimination in violation of the FHA and ADA in denying Chestnut Hill's application for renewal of the Special Use Permit. "Discriminatory intent may be inferred from the totality of

the circumstances, including . . . the historical background of the decision . . .; specific sequence of events leading up to the challenged decision . . .; [and] contemporary statements by members of the decisionmaking body." *LeBlanc*, 67 F.3d at 425 (citations and internal quotation marks omitted). The "initial burden of production under the *McDonnell Douglas* analysis is 'minimal.'" *RECAP*, 294 F.3d 49 (2d Cir. 2002) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993)).

There is evidence that prior to 2017, City of Kingston officials, including the prior mayor, as well as community members expressed disability-based animus against Chestnut Hill and its residents. There is also evidence that this animus influenced the City of Kingston's determination that Chestnut Hill was not a permitted use and attempted eviction of Chestnut Hill's residents. *See Chestnut Hill I*, 2017 WL 11418271, 2017 U.S. Dist. LEXIS 226807. However, Plaintiffs present no evidence that any City of Kingston official that participated in the conduct related to *Chestnut Hill I* had any involvement whatsoever in the current matter. Thus, while the Court is mindful of and considers the history of Chestnut Hill, the Court finds no basis to impute the discriminatory conduct by prior officials to the City of Kingston officials involved in the present case.

The Court has also considered the statements by the six speakers at the March 2023 public hearing and the testimony by Mayor Noble and the affidavit and testimony by Alderwoman Hirsch about the complaints they received about Chestnut Hill from community members. The complaints concerning trespassing, residents sleeping in cars, excess occupancy, garbage, the presence of a sex offender, and noise levels do not appear to suggest disability-based animus. Further, while there is evidence of complaints regarding current alcohol and drug use, the presence of discarded syringes, and overdoses and deaths at Chestnut Hill, (T. 28, 123;

Dkt. No. 19-15, ¶¶ 11–35), the Court notes that under the ADA, "the term 'individual with a disability' does not include an individual who is currently engaging in the illegal use of drugs, when a covered entity acts on the basis of such use." 29 U.S.C. § 705(20)(C)(i). However, Alderwoman Hirsch recounted complaints from community members regarding whether Chestnut Hill was meeting the needs of residents with mobility and psychiatric impairments and the second speaker at the March 2023 public hearing expressed concern about whether there were entrances to accommodate the physically disabled at Chestnut Hill. Even if well-intentioned, these comments and complaints are nonetheless disability-based. *See Laflamme v. New Horizons, Inc.*, 605 F. Supp. 2d 378, 394 (D. Conn. 2009) ("A discriminatory housing practice is still unlawful even if made with good intentions if it denies housing to individuals with disabilities based on their disabilities."). While there is evidence that Alderwoman Hirsch was in communication from time-to-time with Mayor Noble and Knox at Building Safety, [20] there is no evidence that Alderwoman Hirsch directly or indirectly communicated any of the disability-related complaints she received to the Planning Board, Mayor Noble, or the Building Department. (T. 118). At least one of the six speakers at the March 17, 2023 Planning Board meeting referenced the disabilities of the residents, (Dkt. No. 19-11, at 5–8), but those statements were made during the first of five Planning Board meetings and four months before the Planning Board voted to deny Chestnut Hill's renewal application. Thus, even viewing the totality of the circumstances, this thin and attenuated evidence suggests that Plaintiffs are unlikely to succeed

---

[20] Alderwoman Hirsch serves on the City of Kingston Common Council, (T. 110), and in that role, previously served on the housing authority committee and was part of the process of enacting a new zoning code regarding short-term rentals, i.e., Airbnb's. (T. 110–12). Alderwoman Hirsch testified that the Common Council recently "asked for more staffing for code enforcement." (T. 110–13). In or about 2020, Alderwoman Hirsch spoke with the building department when there was a garbage issue in the Chestnut Hill neighborhood. (T. 122). In November 2022, Alderwoman Hirsch spoke with Knox in the Building Department to request the Chestnut Hill property manager's phone number after community members had informed her that an individual had been trespassing on other properties at night. (T. 115, 119). Alderwoman Hirsch also spoke with Mayor Noble about the trespassing issue. (T. 115). In addition, Alderwoman Hirsch worked with a county legislator in connection with a meeting with a group of regarding Chestnut Hill. (T. 123).

in showing that disability-based discrimination was a factor in the Planning Board's decision to deny the renewal application.

However, even if the Court were to assume that Plaintiffs can establish a likelihood of success with respect to their prima facie showing of disability discrimination, they have failed to meet their burden here. Once a plaintiff establishes a prima facie case, the burden shifts to Defendants "to provide a legitimate, nondiscriminatory reason for their decision." *RECAP*, 294 F.3d at 49. As relevant here, the July 17, 2023 resolution cites the following reasons for the Planning Board's decision to deny Plaintiffs' application for renewal of the special use permit: (1) Building Safety's findings of violations "in 2021, ordering corrective action by July 26, 2021," and additional violations "on October 20, 2021, May 10, 2022, and April 12, 2023," including a violation with respect to "the number of residents in the carriage house"; (2) Plaintiffs' failure to remedy the "violation of fire safety requirement 704.1 cited on the 10/20/2021 violation notice . . . until May 1, 2023 leaving the fire alarm notification system to remain inoperable during that time period"; (3) Building Safety's finding "on October 20, 2021 and again on April 12, 2023," that Plaintiffs were in violation of "NYS 1104.16.5.1," that the letter Plaintiffs provided from their engineer regarding the fire escape expressly disclaimed any representations regarding "the design, analysis, load capacity, or overall design and suitability of the subject fire escape," and Plaintiffs' failure to submit a report from an engineer "addressing the structural adequacy" of the fire escape; and (4) the "continu[ing]," "repeated and recurring issues . . . which include issues of public safety." (Dkt. No. 19-57, at 3–4). Although Plaintiffs dispute the validity of these reasons for the Planning Board's denial of the renewal application, the Court finds that Defendants have produced evidence of legitimate, nondiscriminatory reasons. Thus, the burden returns to Plaintiffs.

Plaintiffs argue that the Planning Board's reliance on "a violation with respect to the fire alarm system in an October 20, 2021 inspection report" was "incorrect" and that "never in nine (9) years before April 2023 was the connection to the USA Central Alarm Station raised" as a "problem issue"; that the "Planning Board majority revealed its bias by refusing to acknowledge that the maintenance issues had been addressed by [Sangiovanni] and remedied, most of them immediately"; that they should not be penalized for having one extra bed; and that "no one who inspected the fire escape recommended that its use be discontinued." (Dkt. No. 5-5, at 5–6). Of these arguments, only the first has merit.

In denying Chestnut Hill's application for renewal, the Planning Board indicated that Chestnut Hill had first been notified that the inoperable fire alarm system was out of compliance in the October 20, 2021 notice of violation. (Dkt. No. 19-57, at 4). This is incorrect. The October 20, 2021 notice of violation recites cites the "Ordinance Code," and quotes "PM 704.1," which requires that: "All systems, devices and equipment to detect a fire, actuate an alarm, or suppress or control a fire or any combination thereof shall be maintained in an operable condition at all times in accordance with the International Fire Code." (Dkt. No. 19-24, at 2–3). However, the October 20, 2021 notice of violation's narrative made no reference whatsoever to Chestnut Hill's inactive fire alarm system. (*Id.*). Further, although the fire alarm system had been disabled during the entirety of Sangiovanni's operation of Chestnut Hill, the first reference to the "Fire alarm system not in operation" appears to be in Knox's March 22, 2023 inspection notes. (Dkt. No. 19-28). Nor is there any dispute that Sangiovanni paid to activate the fire alarm system shortly after being notified of the violation.[21] Thus, while the October 20, 2021 notice of violation cites the

---

[21] While Sangiovanni's disagreement with this provision of the Fire Code is well documented, he does not dispute the law requires the fire alarm system to be activated.

relevant code provision, because it does not refer specifically to Chestnut Hill's fire alarm system, the Planning Board's reliance on Chestnut Hill's purported two-year delay in remedying the violation was erroneous. But to show pretext, Plaintiffs must show "that the adverse action was motivated, at least in part, by an impermissible reason." *MHANY Mgmt., Inc. v. Cnty. of Nassau*, 819 F.3d 581, 613 (2d Cir. 2016). Although there is evidence that the Planning Board's finding that Chestnut Hill had been advised as early as 2021 that its non-operational fire alarm system violated the City of Kingston's code in 2021 was erroneous, there is no evidence that this finding was motivated by disability-based discrimination.

As to Plaintiffs' remaining arguments, it is undisputed that Sangiovanni immediately remedied the majority of the violations that Building Safety identified during inspections, but the Planning Board relied on the fact that Building Safety found violations during every inspection—not that Chestnut Hill failed to remedy violations. (Dkt. No. 19-57, at 3 (resolution finding that Building Safety found violations in October 2021, May 2022, and April 2023)). Thus, this argument is without merit. Further, while Plaintiffs fault the Planning Board for "penalize[ing]" them because Sangiovanni "overlook[ed] the shortage of 20 square feet for one more 'legal' bed," they do not dispute that the extra bed was impermissible. There is, therefore, no basis for finding this reason pretextual. In any event, the principal violation on which the Planning Board relied in voting to not renew Chestnut Hill's Special Use Permit was Plaintiffs' failure to provide a report from an engineer stating that the fire escape is structurally sound. (Dkt. No. 19-57, at 3–4). The Special Permit required that the property owner "comply in all respects with the New York State Building Code and Electrical Code and all relevant local laws outside of those specifically listed in the use and area variance," (Dkt. No. 19-43 at 3), and § 1104.16.5.1 of the Fire Code required that "[f]ire escape *stairways*" be examined for structural adequacy and

safety in accordance with Section 1104.16.5 by a registered design professional or others acceptable to the fire code official every 5 years, or as required by the fire code official. Plaintiffs do not dispute that Building Safety had been requesting a structural soundness report since 2021. Nor do Plaintiffs cite law or other evidence indicating that the Planning Board could permissibly infer from the absence of a finding of structural instability that the fire escape was in fact structurally sound. Nor have Plaintiffs provided any evidence that the Planning Board applied the Fire Code unequally or singled out Chestnut Hill[22] in requiring an engineer's report.[23]

Finally, Plaintiffs do not dispute that the Planning Board was entitled to consider the "continu[ing]," "repeated and recurring issues . . . which include issues of public safety," that had been occurring at Chestnut Hill. (Dkt. No. 19-57, at 3–4). Nor have Plaintiffs identified evidence of pretext. Indeed, both the initial resolution approving the special use permit in 2019 and the July 17, 2023 resolution denying the renewal application, recognize the Planning Board's "general authority" to "take into consideration . . . public health, safety and welfare" in evaluating special use permit applications. (Dkt. No. 19-43, at 3; Dkt. No. 19-57, at 3). Chair Platte explained in his affidavit that during the six months preceding the denial, "Chestnut Hill had continuously and consistently shown disregard for the parameters of its special use permit" and that he found it "unlikely" that "residents and the surrounding community would not continue to face unusually high levels of police-involved emergencies." (Dkt. No. 19-40, ¶ 47). Chair Platte noted one such incident at the outset of the July 17, 2023 meeting, stating to

---

[22] Shortly before the Planning Board denied Chestnut Hill's renewal application at the July 17, 2023, meeting, it engaged in a discussion regarding the required engineer's fire escape report with representatives of another Kingston property. *See* City of Kingston, Planning Board meeting 7-17-2023, YOUTUBE (July 17, 2023), https://www.youtube.com/watch?v=fv57zBd_Exk&t=1482s (relevant discussion begins at 34:36).

[23] The Court does not credit Sangiovanni's statements that when he told Stinemire that the Building Department was "telling me that they want a structural accuracy, adequate accuracy report from you," Stinemire responded that "I am giving you the same report I gave to the other twenty fire escapes. I never give a second report." (T. 62). Plaintiff produced no affidavit or other reliable evidence from Stinemire.

Sangiovanni that he had learned that two individuals had overdosed at Chestnut Hill the week before and that one of those individuals had died as a result of the overdose and expressed his concern that there did not "seem that there's proper oversight" on the premises. (Dkt. No. 19-14, at 4). Having concluded that Plaintiffs failed to adduce evidence suggesting "that the defendants intentionally discriminated against them on a prohibited ground," or even that the decision to deny Plaintiffs' renewal application "was motivated, at least in part, by an impermissible reason," *MHANY Mgmt.*, 819 F.3d at 613 (quoting *Cabrera v. Jakabovitz*, 24 F.3d 372, 383 (2d Cir. 1994)), the Court finds Plaintiffs have failed to show a likelihood of success with respect to their intentional discrimination claim.

ii.         **Disparate Impact and Reasonable Accommodation**

Plaintiffs also assert discrimination based on theories of disparate impact and reasonable accommodation. (Dkt. No. 1 ¶ 79; Dkt. No. 5-5, at 8). After reviewing Plaintiffs' moving papers, the Court issued a Text Order directing Plaintiffs to "address and identify" in their Reply and at the hearing "in, specific terms, what reasonable accommodations Plaintiffs have requested and Defendants have refused to make" and to the extent Plaintiffs were "proceeding under a theory of disparate impact," to "identify the neutral policies they are challenging, the members of the 'protected group that are [allegedly] affected by the neutral policy,' and the 'similarly situated persons who are unaffected by the policy.'" (Dkt. No. 18 (quoting *Tsombanidis*, 352 F.3d at 576–77)). In their reply, Plaintiffs argued that "Plaintiffs had done all they could to cooperate with the Defendants Permit renewal process" and that "[t]hey could not tell Mr. Stinemire what to write in his report," and asserted that the Special Use Permit "suggests an obligation for the City to try to achieve an accommodation rather than eviction." (Dkt. No. 24, at 1–4 (citing Dkt. No. 19-50, at 2)). Plaintiffs did not, however, identify in their reply or at the hearing, any similarly situated persons who" are unaffected or the reasonable accommodation they are

seeking—other than to continue operating.[24] Accordingly, the Court concludes that Plaintiffs have failed to establish a likelihood of success on their disparate impact and reasonable accommodation theories of liability.

### 3.      Balance of Hardships and Public Interest

Plaintiffs' failure to demonstrate a likelihood of success on the merits is sufficient to deny injunctive relief. *See Salinger*, 607 F.3d at 75 n.5; *Faiveley*, 559 F.3d at 119. Accordingly, the Court need not consider the remaining balance of hardships and public interest factors. *Conn. State Police Union v. Rovella*, 36 F.4th 54, 68 (2d Cir. 2022) ("Because the District Court did not err in concluding that the [plaintiff] could not succeed on the merits of its claim, we need not address the remaining prongs of the preliminary injunction test, including whether the [plaintiff] demonstrated irreparable harm or whether an injunction would be in the public interest."), *cert. denied*, No. 22-116, 2022 WL 4654636, 2022 U.S. LEXIS 4041 (U.S. Oct. 3, 2022).

## IV.    CONCLUSION

For these reasons, it is hereby

**ORDERED** that Plaintiffs' motion for a temporary restraining order and preliminary injunction (Dkt. No. 5) is **DENIED.**

**IT IS SO ORDERED.**

Dated:   October 13, 2023
             Syracuse, New York

Brenda K. Sannes
Chief U.S. District Judge

---

[24] To the extent Plaintiffs' request to continue operating is, in effect, a request for a waiver of the fire escape structural stability inspection requirement—which appeared to be the driving factor in the Planning Board's decision to deny the renewal application—Plaintiffs have failed to show that such accommodation is necessary to permit the disabled residents an equal opportunity "to use and enjoy a dwelling." *RECAP*, 294 F.3d at 53 ("A municipality discriminates in violation of the FHA[A] [or] the ADA . . . if it refuses to make changes to 'traditional rules or practices if necessary to permit a person with handicaps an equal opportunity to use and enjoy a dwelling.'" (quoting *Shapiro v. Cadman Towers, Inc.*, 51 F.3d 328, 333 (2d Cir. 1995))); *see also Quad Enterprises Co., LLC v. Town of Southold*, 369 F. App'x 202, 207–08 (2d Cir. 2010) ("In order to fulfill this element, Plaintiffs needed to provide evidence that 'the desired accommodation will affirmatively enhance a disabled plaintiff's quality of life by ameliorating the effects of the disability.'" (quoting *Bronk v. Ineichen*, 54 F.3d 425, 429 (7th Cir. 1995))).