**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

CHESTNUT HILL NY, INC., THOMAS RIKER, JOHN
STURM, AND JAE CURTIS,

                           Plaintiffs,

v.

CITY OF KINGSTON,

                           Defendant.

1:23-cv-01024 (BKS/DJS)

_____

**Appearances:**

_For Plaintiffs:_
Joshua E. Mackey
Mackey Butts & Whalen, LLP
3208 Franklin Avenue
Millbrook, New York 12545

_For Defendant:_
Barbara Graves-Poller
Matthew Jankowski
Corporation Counsel
City of Kingston
420 Broadway
Kingston, New York 12401

**Hon. Brenda K. Sannes, Chief United States District Judge:**

**MEMORANDUM-DECISION AND ORDER**

## I.      INTRODUCTION

Plaintiffs Chestnut Hill NY, Inc., Thomas Riker, John Sturm, and Jae Curtis bring this

disability discrimination action against the City of Kingston in connection with the denial of a

special use permit for the operation of a "group home" located at 106 West Chestnut Street in

Kingston, New York. (Dkt. No. 58). Plaintiffs bring the following claims: (1) disability

discrimination in violation of the Fair Housing Act ("FHA"), 42 U.S.C. §§ 3604, et seq. and Title

II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12131, et seq.; (2) failure to

provide a reasonable accommodation, in violation of the ADA; and (3) deprivation of substantive

due process, in violation of the Fourteenth Amendment, 42 U.S.C. § 1983. (*Id.*). Presently before

the Court are Defendant's motion to dismiss the Amended Complaint under Federal Rules of

Civil Procedure 12(b)(1) and 12(b)(6), (Dkt. No. 19),[1] and Plaintiffs' second motion for a

preliminary injunction under Federal Rule of Civil Procedure 65 seeking to stay eviction

proceedings, (Dkt. No. 44). The motions are fully briefed. (Dkt. Nos. 21, 24, 44, 48, 49, 51). For

the reasons that follow Defendant's motion to dismiss is granted in part and denied in part and

Plaintiffs' motion for a preliminary injunction is denied.

## II.   FACTS[2]

The "group home" at issue in this case, 106 West Chestnut Hill, was the subject of a prior

action in this Court. *Chestnut Hill NY, Inc. v. City of Kingston* ("*Chestnut Hill I*"), No. 17-cv-

---

[1] After Defendant filed its motion to dismiss, (Dkt. No. 19), Plaintiffs filed an Amended Complaint, (Dkt. No. 43). The Court therefore directed Defendant to file a letter indicating whether it wished the Court to consider the pending motion to dismiss in light of the facts in the Amended Complaint, or intended to withdraw or refile the motion to dismiss. (Dkt. No. 38). Defendant has requested that the Court consider its motion in light of the facts alleged in the Amended Complaint, and asserted that its pending motion to dismiss "sufficiently addresses plaintiff's [sic] newly asserted substantive 'due process' claim." (Dkt. No. 48, at 1–2). Indeed, the issue was briefed as part of Plaintiffs' simultaneously-filed second motion for preliminary injunction. (Dkt. No. 44-3, at 13–17; Dkt. No. 48, at 2; Dkt. No. 51, at 11). Plaintiffs subsequently filed a Second Amended Complaint, (Dkt. No. 58), replacing the John Doe Plaintiffs with the above-named Plaintiffs in accordance with United States Magistrate Judge Daniel J. Stewart's denial of Plaintiffs' motion to proceed by pseudonym. (Dkt. No. 54; see also Dkt. No. 57 (Text Order directing the filing of a "Second Amended Complaint which identifies each Doe Plaintiff by name")). The Second Amended Complaint is otherwise identical to the Amended Complaint.

[2] The facts are taken from the Amended Complaint and from materials of which the Court may take judicial notice, specifically, the Kingston City Code. *See infra* note 12. The Court assumes the truth of, and draws reasonable inferences from, the well-pleaded factual allegations, *see Lynch v. City of New York*, 952 F.3d 67, 74–75 (2d Cir. 2020), but does not accept as true the legal conclusions, *see Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Throughout its memorandum of law in support of its motion to dismiss, Defendant cites to the transcript of the evidentiary hearing as well as other materials filed or cited in connection with the first motion for a preliminary injunction. (*See* Dkt. No. 19, at 28–32). However, as Defendant fails to address a basis on which the Court may properly consider such materials, the Court has not considered this issue in the first instance and has excluded them from its consideration of the motion to dismiss. *See Palin v. New York Times Co.*, 940 F.3d 804, 810–11 (2d Cir. 2019) (explaining that when matters outside the pleadings are presented and are not "integral" to the complaint or subject to judicial notice, Rule 12(d) "presents district courts with only two options: (1) 'the court may exclude the additional material and decide the motion on the complaint alone' or (2) 'it may convert the motion to one for summary judgment under Fed. R. Civ. P. 56 and afford all parties the opportunity to present supporting material'" (quoting Fed. R. Civ. P. 12(d))).

0095, 2017 WL 11418271, 2017 U.S. Dist. LEXIS 226807 (N.D.N.Y. Feb. 22, 2017). The events leading to *Chestnut Hill I* are set forth at length in *Chestnut Hill NY, Inc. v. City of Kingston ("Chestnut Hill II")*, No. 23-cv-01024, 2023 WL 6796622, at *2, 2023 U.S. Dist. LEXIS 184157, at *3–*8 (N.D.N.Y. Oct. 13, 2023).

    **A.**    **The Parties**

Plaintiff Chestnut Hill NY, Inc., is a corporation organized and existing under the laws of the State of New York. (Dkt. No. 58, ¶ 3). "Chestnut Hill owns and operates a group home" located at 106 West Chestnut Street in Kingston "for persons with various disabilities." (*Id.* ¶ 3). The "group home" is "a fourteen bedroom Victorian mansion with an adjacent cottage and has operated as a group home for ill and disabled persons for approximately seven decades." (*Id.* ¶ 11). Chestnut Hill "provides a family home setting in a single-family residential neighborhood away from drugs and alcohol, for persons recovering from drug and alcohol addiction . . . in order to facilitate their continued recovery." (*Id.* ¶ 4). Residents "also include individuals with mental and physical disabilities, including disabilities that impair their mobility." (*Id.*).

Plaintiff Jae Curtis has lived at the group home for four years and "has been diagnosed with bipolar disorder and schizophrenia." (*Id.* ¶ 6). Plaintiff Thomas Riker "has lived at the Group Home for approximately four years and . . . suffers from severe depression and is under the care of therapist [sic] on a weekly basis." (*Id.* ¶ 7). Plaintiff John Sturm "has lived at the Group Home for approximately four years" and "suffers from being mentally challenged and is unable to read, write, or perform the basic functions necessary to live autonomously." (*Id.* ¶ 8).

Defendant City of Kingston "is a municipal subdivision" and "is governed by a Mayor and City Council which enact and oversee the zoning and planning laws of the City of Kingston." (*Id.* ¶ 9).

In 2019, following the litigation of *Chestnut Hill I*, and "[a]fter months of review and a public hearing," the City Planning Board granted Chestnut Hill a special use permit and site plan approval for the continued operation of 106 West Chestnut Street. (*Id.* ¶ 28). The Planning Board "imposed a variety of conditions in the special use permit, including regular inspections at a minimum of once per year for permit renewal, as well as occupancy limits that complied with state building codes and the New York State Multiple Dwelling Law." (*Id.* ¶ 29). "In granting the use variance, the Zoning Department specified that the hardship plaintiff proved to obtain the use variance was the fact that the only viable use for this premises was such as a boarding house or group home." (*Id.* ¶ 33). The special use permit was renewed annually until 2023. (*Id.* ¶ 36).

Chestnut Hill and Joe Sangiovanni, the manager of group home, "have invested large sums of money and time into the renovation, upkeep and operation of the Group Home to comply with the requirements of" the City's Zoning and Planning Departments and the laws of the State of New York. (*Id.* ¶ 30). Sangiovanni "oversees the Group Home's operation and is available twenty-four hours per day, seven days per week to address the needs and concerns of the Group Home and its residents." (*Id.* ¶ 31).

### B.    Application for Renewal of Special Use Permit

On January 23, 2023, the Planning Board sent Chestnut Hill a letter stating that "the special use permit expired on February 22, 2023 and that [Sangiovanni] would have to submit an application by February 3, 2023." (*Id.* ¶ 35). Sangiovanni requested and received an extension of time and the Planning Board meeting scheduled for February 21, 2023, was adjourned until March 20, 2023. (*Id.* ¶ 35).

### C.    March 20, 2023 Planning Board Meeting

A public hearing was held at the March 20, 2023 Planning Board meeting, at which "six neighbors of the Group Home testified":

- The first speaker stated that he had "been complaining to the Board at hearings and with letters and to other appropriate departments about this boarding house," and that he "had a meeting with the former Corporation Counsel and was assured that they would get relief." (*Id.* ¶ 39.a).

- The second speaker stated that "we all heard the phrase not in my backyard, 106 West Chestnut Street boarding house is in my backyard," "objected to how the boarding house was operated, but acknowledged there was a need for housing and services and that there was a housing and mental health crisis in the City of Kingston," stated that "the boarding house is operating without abiding by the laws of the City of Kingston," that "neighbors have had syringes and empty alcohol containers on their property," "asked the Board if the fire escape on the third floor was legal," and asserted that "residents have to pass through another bedroom in order to get to the fire escape." (*Id.* ¶ 39.b).

- The third speaker opposed renewal of the special use permit, "set forth various items that she thought were required according to zoning law and stated that she hoped the upcoming inspection would focus on those things," and stated that "she would like to see a plan in place to reduce capacity of the boarding house through attrition and to work with social services to find another appropriate housing." (*Id.* ¶ 39.c).

- The fourth speaker stated that her daughter lived in the West Chestnut Street neighborhood and that from her daughter's porch, she saw "people coming out of the boarding house that have not been able to stand," and that "[t]hey waddle, they struggle, they are definitely intoxicated or on drugs," that she found a hypodermic needle on the lawn while walking the dog, and that she believed "someone in the home was a sex offender," and asked the Planning Board "if this is someone they would want living around their children." (*Id.* ¶ 39.d).

- The fifth speaker was the husband of the fourth speaker and stated that "the boarding house is not complying with the 'code' because of the number of residents in the home," that he was worried because his daughter was "going to have a baby" and asked the Planning Board "to picture themselves living in this neighborhood and to ask themselves if this is OK" and that if they could, he "hope[d] to God

you never have to reckon with [this] if something goes wrong." (*Id.* ¶ 39.e).[3]

- The sixth speaker stated that she lived in the West Chestnut neighborhood and that she and her neighbors "are very concerned that the Board has not heard their concerns and fears in past about this house being where it is" and that although "in the past it had been used as a boarding house for other people and there were no problems with those people who had disadvantages in life, but currently it is not ok, the fact that they have to see syringes and other garbage in their yards," and that "she feared that a resident might come into their homes." (*Id.* ¶ 39.g). The public hearing then closed and Sangiovanni "was permitted to speak."[4] (*Id.* ¶ 39.h).

At the meeting, Board member Suzanne Cahill informed the Planning Board that she had spoken with the police chief the day before and had learned that "a resident of the boarding house had died of an overdose." (*Id.* ¶ 39.j). Cahill further stated that she and the police chief spoke "about the number of police calls to the boarding house and the types of calls that have been recorded over the past year." (*Id.*). Cahill asked whether "there was a resident manager that lived on sight to manage the property 24/7," "about the Group Home's rules and regulations about random drug testing" and whether Sangiovanni was "conducting this random drug testing." (*Id.*). Sangiovanni responded that "he conducts drug screenings of residents if there is an incident." (*Id.*). The Planning Board adjourned and planned to meet again in thirty days, after the building inspector's scheduled March 22, 2023 inspection. (*Id.* ¶ 39.k.).

### D.   Inspection and Notice of Violation

During the March 22, 2023 inspection, Assistant Building Inspector Matthew Martino asked Building Inspector Stephan Knox, in Sangiovanni's presence: "Hey Steve, what's going on

---

[3] At this point, Sangiovanni "asked to respond to these people, but was denied," and was told by "Board Member Cahill . . . that, 'this is the public hearing, after the public hearing is over, then you will get a chance to speak.'" (*Id.* ¶ 39.f).

[4] The Amended Complaint contains no allegations regarding what Sangiovanni said following the public hearing.

here? We go into buildings that have hundreds of violations that never get repaired, but whenever we come here, this place is beautiful and [Sangiovanni] and these guys run around and fix everything while we're still here, why are we giving [Sangiovanni] such a hard time?" (*Id.* ¶ 40).

On April 12, 2023, the Department of Building Safety and Zoning Enforcement issued Chestnut Hill a "violation Notice/Order to Remedy" as a result of the March 22 inspection and directed that "all items must be corrected and rescheduled" for another inspection on April 26, 2023. (*Id.* ¶ 41). The notice identified the following issues/violations: the fire alarm system "had to be operational and tested, or the fire pull stations had to be covered up"; a basement bedroom "was ordered closed . . . for failing to comply with the building code" as "a window had been painted over and would not open," creating "an egress issue"; "[o]ne bed in the rear cottage had to be removed because the bedroom lacked an additional 20 square feet required by the building code"; the tile floor in third-floor bathroom that "was in the process of being re-tiled and . . . needed to be completed"; "[t]he tag on one fire extinguisher . . . was outdated"; "[r]ooms 7 and 8 each had one extra bed"; "[t]he screws for the cover plate on an electrical outlet in room 7 had to be tightened"; "minor holes and dents . . . needed to be patched"; "[t]he light bulb in the exit sign . . . needed to be replaced"; "one window in the second floor restroom that was . . . painted shut and needed to be operational"; an "outlet cover in the second floor restroom needed to be replaced"; "a stone wall column . . . was unfinished and not the proper length"; and "[t]he front porch needed some minor repairs." (Dkt. No. 58, ¶ 42.b.–n).

The notice of violation also listed the fire escape. (*Id.* ¶ 42.a). The fire escape had been the subject of an October 2021 inspection by John Stinemire, P.E., an engineer. (*Id.* ¶ 42.a.i). At that time, Stinemire identified the following "maintenance items": "bottom stair tread should be

replaced and the stair tread directly above that should be straightened and reinstalled"; the horizontal components of upper landing railings "needed to be securely fastened"; "[o]ne concrete foundation element needed to be replaced with a new concrete pier"; "[o]ne diagonal steel brace needed to be replaced and welded into place"; and "[t]he steel would need to be cleaned and repainted within the next few years." (*Id.* ¶ 42.a.i.1–5). Sangiovanni repaired all but the diagonal brace and the horizontal railings in 2021. (*Id.* ¶ 42.a.ii).

Sangiovanni attended to several of the noticed items "while the building inspector was still there." (*Id.* ¶ 42.d). Specifically, Sangiovanni "removed the bed" from the rear cottage, repaired the "light bulb in the exit sign," and fixed the window in the second floor restroom that had been painted shut." (*Id.* ¶ 42.d, j, k). "Shortly thereafter," Sangiovanni completed the other noticed repairs and notified the building inspector, who returned on April 17, 2023, to inspect the premises again. (*Id.* ¶ 44).

In an April 17, 2023 e-mail from Stephan Knox to Board Member Cahill, Knox stated:

> Building Safety conducted a follow-up inspection of 106 W. Chestnut Street today at 2:00 p.m. All of the smaller items have been corrected and the beds we required be removed in the rear cottage and basement were gone. The fire alarm system, which was not required at the time of construction, is not working. Code requires that non-required systems be maintained but may also be removed or have not visible signs of an installed system. The pull stations and strobes will temporarily be covered until Fisher Alarms restores the system to full working order. The fire escape repairs have been made and John Stinemire will be there April 25, @ 2:00 p.m. to do his follow-up inspection. All smoke and carbon monoxide detectors are operational. With the removal of the basement beds there were 39 total beds in the buildings. I am willing to issue a 30-45 day operating permit at this point.

(*Id.* ¶ 45).[5]

---

[5] Sangiovanni retained "Fischer Security and Electronic Systems, Inc., who put the fire alarm system back online" and on May 2, 2023, submitted a report "evidencing this" to the Building Department. (Dkt. No. 58, ¶¶ 42.b, 46).

On April 26, 2023, Stinemire conducted an inspection and on May 24, 2023, issued a report noting that all items identified in his October 2021 report had been repaired except for the two items referenced previously. (*Id.* ¶ 42.a.ii). On May 30, 2023, Sangiovanni submitted Stinemire's May 24, 2023 inspection report to the Planning Board and informed the Board that the repairs had been complete" and "provided pictures . . . evidencing that the repairs were complete." (Dkt. No. 58, ¶ 42.a.iii).

### E.   Denial of Application for Renewal of Special Use Permit

At the July 17, 2023 Planning Board meeting, a board member reported that "there was an unfortunate incident at the facility this past week that there was an overdose and that one person died at the facility." (*Id.* ¶ 52). "This Board Member" also stated that: "during the course of different approvals that the Board has given over the years, right now there doesn't necessarily seem that there is proper oversight or a manager of day to day operations for the population that serves there," that "there have been a number of incidents that have happened there like the one this past week," and that "there have been numerous police reports for this property over the years." (*Id.* ¶ 53). The Board asked about "the issue of the fire escape and for a report from an engineer that the fire escape is suitable for this structure," and stated that it required "proof that the fire escape is certified." (*Id.* ¶ 55). The Board rejected Stinemire's May 24, 2023 report "because of the language in the fourth paragraph."[6] (*Id.* ¶ 56). The Planning Board noted that Knox, its building inspector, had performed a follow-up inspection the week before their meeting and noted that Knox "had not indicated that anything was wrong with the fire escape." (*Id.* ¶ 58). Ultimately, the Planning Board issued a resolution denying Chestnut Hill's application for renewal of the special use permit and finding:

---

[6] Plaintiffs failed to include the "language in the fourth paragraph" in the Amended Complaint. (Dkt. No. 58, ¶ 56).

1. "Whereas, the violation of fire safety requirement 704.1, cited on the 10/20/2021 violation notice was not remedied until May 1, 2023 leaving the fire alarm notification system to remain inoperable during that time period." (*Id.* ¶ 60).

2. "Whereas, on October 20, 2021 and again on Aril 12, 2023 violations were cited of NYS 1104.16.5.1, pertaining to the exterior metal fire escape used as a primary means of resident ingress and egress."[7] (*Id.* ¶ 61).

3. "Whereas on April 26, 2023 an engineer hired by applicant conducted a condition inspection of the exterior steel fire escape, which is used by residents as a regular means of ingress and egress." (*Id.* ¶ 62).

4. "Whereas, the engineer indicated that the letter 'is a condition inspection only and does not include any comments, representations or conclusions regarding the design, analysis, load capacity, or overall design and suitability of the subject fire escape.'" (*Id.* ¶ 65).

5. "Whereas, in June 2023 applicant reported that a resident is sleeping in the basement and blocking the basement fire escape in violation of the building code and the violation was confirmed by the building department." (*Id.* ¶ 66).

In denying Chestnut Hill's application, the Planning Board noted that it had given the applicant "a period of more than 60 days . . . to bring the property in full compliance" but that Chestnut Hill had failed to comply with "the conditions set forth in the permit." (*Id.* ¶¶ 59, 67).

Chestnut Hill disputes the findings in the Planning Board's resolution. The 2021 violation cited in Item 1, for example, concerned the kitchen fire suppression system, not the fire alarm notification system, and had been, as demonstrated by the Gordon Fire Equipment report "provided to the City," remedied in 2021. (*Id.* ¶ 60.a). Further, Chestnut Hill was first notified of

---

[7] The New York State Uniform Fire Prevention and Building Code states that the "2020 Fire Code of New York State" is published by the International Code Council, Inc. 19 NY ADC § 1219.2(a)(3).  Section 1104.16.5.1 states: "Fire escape *stairways* and balconies shall be examined for structural adequacy and safety in accordance with Section 1104.16.5 by a registered design professional or others acceptable to the fire code official every 5 years, or as required by the *fire code official*. An inspection report shall be submitted to the *fire code official* after such examination." https://codes.iccsafe.org/content/NYSFC2020P1/chapter-11-construction-requirements-for-existing-buildings#NYSFC2020P1_Pt03_Ch11_Sec1105 (last visited July 15, 2024).

an issue with the fire alarm notification system in March 2023, at which point Sangiovanni "had the system put back online and it was fully functional." (*Id.* ¶ 60.b).

Item 2, the October 20, 2021 violation of NYS 1104.16.5.1, pertaining to the exterior metal fire escape, did not "note any violation of the fire escape, it only noted that the fire escape had to be examined for structural adequacy and safety." (*Id.* ¶ 61.a). In addition, "Plaintiff did comply with this request on November 4, 2021," (*id.* ¶ 61.b), and as the "Board and Building Inspector" knew, "the fire escape was only used for emergency purposes and not . . . 'as a primary means of resident ingress and egress,'" and "the doors leading to the fire escape had alarms that would sound when opened." (*Id.* ¶ 61.c). The Planning Board omitted from items 2, 3, and 4, "the fact that all repairs recommended by [Stinemire] were in fact repaired," as verified, and communicated to the Planning Board, by the building inspector. (*Id.* ¶ 63). Although Stinemire included language stating that his inspection "does not include any comments, representations or conclusions regarding the design . . . and suitability of the subject fire escape" in "every fire escape inspection report . . . in no other instance has the City ever taken issue with that language." (*Id.* ¶ 65.a).

As to item 5, Chestnut Hill notified the building department in June 2023, "that this person voluntarily left the basement" and the Board was "fully aware that this person no longer resided in the basement" when it issued its July 17, 2023 resolution. (*Id.* ¶ 66.a).

### F.   August 14, 2023 Fire Escape Report and Accommodation Request

On August 14, 2023, Stinemire issued an engineering report stating that all of the required repairs to the fire escape have been completed and no further work is needed at this location. He also stated that the fire escape was found to be structurally sound at the time of his inspection. (*Id.* ¶ 47). "Plaintiffs requested that defendant accept the multiple reports from their engineer showing that the fire escape was not in an unsafe condition as a reasonable

11

accommodation to continue [to] operate the Group Home" but their "request was ignored." (*Id.* ¶ 67.c).

## III.    MOTION TO DISMISS

### A.    Standard of Review

"A court faced with a motion to dismiss pursuant to both Rules 12(b)(1) and 12(b)(6) must decide the jurisdictional question first because a disposition of a Rule 12(b)(6) motion is a decision on the merits and, therefore, an exercise of jurisdiction." *Mann v. N.Y. State Ct. of Appeals*, No. 21-cv-49, 2021 WL 5040236, at *3, 2021 U.S. Dist. LEXIS 209018, at *8 (N.D.N.Y. Oct. 29, 2021) (citation omitted). "In resolving a motion to dismiss under Rule 12(b)(1), the district court must take all uncontroverted facts in the complaint (or petition) as true, and draw all reasonable inferences in favor of the party asserting jurisdiction." *Tandon v. Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d 239, 243 (2d Cir. 2014) (citation omitted). The Court may also "refer to evidence outside the pleadings" and "take judicial notice of documents in the public record, including state court filings." *Krajisnik Soccer Club, Inc. v. Krajisnik Football Club, Inc.*, No. 20-cv-1140, 2021 WL 2142924, at *2, 2021 U.S. Dist. LEXIS 99456, at *5 (N.D.N.Y. May 26, 2021) (citations omitted).

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a complaint must provide 'enough facts to state a claim to relief that is plausible on its face.'" *Mayor & City Council of Balt. v. Citigroup, Inc.*, 709 F.3d 129, 135 (2d Cir. 2013) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Although a complaint need not contain detailed factual allegations, it may not rest on mere labels, conclusions, or a formulaic recitation of the elements of the cause of action, and the factual allegations 'must be enough to raise a right to relief above the speculative level.'" *Lawtone-Bowles v. City of New York*, No. 16-cv-4240, 2017 WL 4250513, at *2, 2017 U.S. Dist. LEXIS 155140, at *5 (S.D.N.Y. Sept. 22, 2017)

(quoting *Twombly*, 550 U.S. at 555). A court must accept as true all well-pleaded factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor. *See EEOC v. Port Auth.*, 768 F.3d 247, 253 (2d Cir. 2014) (citing *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007)). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678.

### B.    Discussion

#### 1.    Standing

Defendant asserts that "Chestnut Hill has not alleged facts establishing either associational or organizational standing to pursue FHA claims." (Dkt. No. 19-1, at 26–27).[8] Specifically, Defendant notes that it is a "for-profit corporation, that has failed to comply with New York State Department of State registration requirements and does not appear in any New York State Department of State registration requirements." (*Id.* at 26). Defendant further argues that Chestnut Hill fails to "allege[] in a non-conclusory fashion that it 'serves a class of individuals with discrimination claims.'" (*Id.* at 26).

The jurisdiction of federal courts is limited to "Cases" and "Controversies." U.S. Const., art. III, § 2; *see also In re Clinton Nurseries, Inc.*, 53 F.4th 15, 22 (2d Cir. 2022). The doctrine of standing "gives meaning to these constitutional limits by "identify[ing] those disputes which are appropriately resolved through the judicial process." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157, (2014) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)); *see also Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). To establish standing, "a plaintiff must show (1) an 'injury in fact,' (2) a sufficient 'causal connection between the injury and the conduct

---

[8] Defendant also argued that Sangiovanni, who was named as a plaintiff in the original complaint, lacked standing. (Dkt. No. 19-1, at 27). As Sangiovanni is no longer a plaintiff in this case, (*see* Dkt. No. 58), the Court need not address this argument.

complained of,' and (3) 'a likel[ihood]' that the injury 'will be redressed by a favorable

decision.'" *Susan B. Anthony List*, 573 U.S. at 157–58, (quoting *Lujan*, 504 U.S. at 560–61). An

injury must be "concrete and particularized" and "actual or imminent," not "conjectural or

hypothetical." *Id.* at 158, (quoting *Lujan*, 504 U.S. at 560).

As to Defendant's first argument, the Court notes that Defendant cites no authority for

the proposition that failure to comply with state registration requirements deprives a corporation

of standing. Defendant's second argument is also unavailing. Chestnut Hill alleges that it

provides housing to disabled individuals, including individuals with physical and mental

disabilities as well as recovering alcoholics, and that Defendant's denial of the renewal of the

Special Use Permit will result in the eviction of these individuals. (*See generally* Dkt. No. 58).

"[F]ederal courts have held that a person who is not himself handicapped, but who is prevented

from providing housing for handicapped persons by a municipality's discriminatory acts, has

standing to sue under the FHA." *Step By Step, Inc. v. City of Ogdensburg*, 176 F. Supp. 3d 112,

124 (N.D.N.Y. 2016) (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 372 (1982)); *see*

*also Hum. Res. Rsch. & Mgmt. Grp., Inc. v. Cnty. of Suffolk*, 687 F. Supp. 2d 237, 253 (E.D.N.Y.

2010) (concluding "that Oxford House has standing to prosecute" the disability discrimination

action as "an individual plaintiff because it has demonstrated that it is substantially likely to be

injured, that the injury would be caused by the enforcement of [the law], and that the injury

would be redressed by the remedy sought in this action"); *Tsombanidis v. W. Haven Fire Dep't*,

352 F.3d 565, 574 n.6 (2d Cir. 2003) (finding Tsombanidis, owner of residence known as

"Oxford House-Jones Hill," and Oxford House, Inc.,  parent organization, which provided homes

for recovering alcoholics and drug addicts, had standing to sue fire district and city under FHA

and ADA, noting "it is clear that both Tsombanidis, as owner of the home, and OHI, as the

parent organization, will incur an injury and have standing in this case"). Accordingly, Defendant's motion to dismiss Chestnut Hill for lack of standing is denied.

### 2.      FHA and ADA Discrimination

Defendant moves to dismiss Plaintiffs' FHA and ADA discrimination claims on the grounds that the Amended Complaint fails to allege facts establishing discriminatory animus" on the basis of disability in connection with the Planning Board's denial of Chestnut Hill's application for renewal of the special use permit or that Plaintiffs "sought a reasonable accommodation to address any disability-related needs." (Dkt. No. 19-1, at 27–32).

The FHA makes it unlawful "[t]o discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap of" the buyer or renter or any person associated with that buyer or renter. 42 U.S.C. § 3604(f)(1). The ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. "Due to the similarities between" the FHA and ADA, courts consider intentional discrimination claims under them "in tandem." *Tsombanidis*, 352 F.3d at 573 n.4. These provisions are applicable to municipal zoning decisions. *Forest City Daly Hous., Inc. v. Town of North Hempstead*, 175 F.3d 144, 151 (2d Cir. 1999). "To establish discrimination under either the [FHA] or the ADA, plaintiffs have three available theories: (1) intentional discrimination (disparate treatment); (2) disparate impact; and (3) failure to make a reasonable accommodation." *Tsombanidis*, 352 F.3d at 573. Plaintiffs' Amended Complaint alleges discrimination under the theories of disparate treatment and failure to make a reasonable accommodation.

a.       **Disparate Treatment**

Defendant argues that it is entitled to dismissal of Plaintiff's disparate treatment theory of

liability because Plaintiff fail to allege facts allowing a plausible inference of disability-based

animus based on the community views articulated at the March 20, 2023 public hearing or in the

Planning Board's handling of Chestnut Hill's application for renewal of the special use permit.

(Dkt. No. 19-1, at 27–30). Plaintiff responds that the factual allegations regarding public

negativity toward disabled residents and the Planning Board's refusal to acknowledge the repairs

that had been made to the group home adequately allege intentional discrimination. (Dkt. No. 44-

3, at 7–12).

"[A] plaintiff can survive a motion to dismiss if the plaintiff can allege facts that support

a plausible claim that the plaintiff was 'a member of a protected class,' suffered relevant

'adverse' treatment, and 'can sustain a minimal burden of showing facts suggesting an inference

of discriminatory motivation.'" *Thompson v. CRF-Cluster Model Program, LLC*, No. 19-cv-

1360, 2020 WL 4735300, at *10, 2020 U.S. Dist. LEXIS 147003, at *25 (S.D.N.Y. Aug. 14,

2020) (discussing allegations required to allege FHA disparate treatment claim) (quoting

*Littlejohn v. City of New York*, 795 F.3d 297, 311 (2d Cir. 2015)). To show disparate treatment, a

plaintiff must allege facts allowing a plausible inference "that animus against the protected group

was a significant factor in the position taken by the municipal decision-makers themselves or by

those to whom the decision-makers were knowingly responsive." *Mhany Mgmt., Inc. v. Cnty. of*

*Nassau*, 819 F.3d 581, 606 (2d Cir. 2016) (quoting *LeBlanc–Sternberg v. Fletcher*, 67 F.3d 412,

425 (2d Cir. 1995)).

Drawing all inferences in Plaintiffs' favor, it is plausible to infer that disability-based

animus was a significant factor in the position taken by the individuals who spoke in opposition

to the renewal of the special use permit at the public hearing before the Planning Board

members, who were responsible for making the renewal decision. While Defendant claims that

"observable needles near the site of multiple, recent drug overdoses" do not reflect

discriminatory animus, (Dkt. 19-1, at 28), according to the Amended Complaint, at the March

20, 2023, public hearing, several community members spoke in opposition to renewal of the

special use permit, referencing "not in my backyard," expressing alarm about residents' physical

abilities, (*see* Dkt. No. 58, ¶ 39.d (stating that residents "have not been able to stand," and that

"[t]hey waddle, they struggle")), and suggesting that the involvement by social services was

needed to find appropriate housing for the individuals living there. *See Laflamme v. New

Horizons, Inc.*, 605 F. Supp. 2d 378, 386 (D. Conn. 2009) (explaining that the FHA "repudiates

the use of stereotypes and ignorance, and mandates that persons with handicaps be considered as

individuals. Generalized perceptions about disabilities and unfounded speculations about threats

to safety are specifically rejected as grounds to justify exclusion." (citations omitted)); *Green v.

City of New York*, 465 F.3d 65, 78 (2d Cir. 2006) (noting that circumstantial evidence in ADA

case supported a "finding of discriminatory intent, and in particular an intent based on a

stereotypical view of the abilities of a seriously physically handicapped individual"); *see also

Mhany Mgt.*, 819 F.3d at 607 (determining "whether the sequence of events leading up to a

challenged action supports an inference of discriminatory intent," requires courts to consider

"whether the challenged decision was made 'in the context of strong, discriminatory

opposition[,]' (quoting *Innovative Health Sys., Inc. v. City of White Plains*, 117 F.3d 37, 49 (2d

Cir. 1997)); *see also Innovative Health Sys.*, 117 F.3d at 49 (stating that "a decision made in the

context of strong, discriminatory opposition becomes tainted with discriminatory intent even if

the decisionmakers personally have no strong views on the matter") (citations omitted).

Although the hearing took place four months before the Planning Board made its decision, when considered together with the allegations that the Planning Board's issued resolution denying the special use permit contained at least two incorrect findings—one concerning the length of time the fire alarm had been out of compliance and a second concerning residents' use of the fire escape for resident ingress and egress—it is also plausible to infer that animus against residents with disabilities was a significant factor on the Planning Board's denial of Chestnut Hill's application to renew the special use permit. *See Rehab. Support Servs., Inc. v. Town of Colonie*, No. 15-cv-589, 2018 WL 1415199, at *13 (N.D.N.Y. Mar. 20, 2018) (determining whether discriminatory intent may be inferred requires court to "look to whether those who made the challenged zoning decision provided 'credible justification' for that decision" (quoting *Innovative Health Sys., Inc.*, 117 F.3d at 49)).

It is plausible to infer disability bias from disability-based comments by individuals at the public hearing and that there was no credible justification for at least one of the findings underlying the Planning Board's denial of the special use permit, namely, the finding that "the violation of fire safety requirement 704.1, cited on the 10/20/2021 violation notice was not remedied until May 1, 2023, leaving the fire alarm notification system to remain inoperable during that time period." (Dkt. No. 58, ¶ 60). According to the Amended Complaint, not only had Chestnut Hill remedied the 2021 fire safety violation, which concerned the kitchen fire suppression system—not the fire alarm notification system—in 2021, (*id.* ¶ 60.a), but the issue with respect to the fire alarm notification system was identified in March 2023, at which point Sangiovanni "had the system put back online and it was fully functional." (*Id.* ¶ 60.b.). Thus, Plaintiffs have alleged facts that allow a plausible inference of disability-based discrimination in

connection with the denial of its special use permit. Accordingly, Defendant's motion to dismiss Plaintiff's disparate treatment claim is denied. [9]

## b.    Reasonable Accommodation[10]

Defendant argues that Plaintiffs fail to allege facts showing that their request for reasonable accommodation—that the Planning Board waive fire safety requirements and accept Stinemire's reports regarding the group home's fire escape—relates to their disabilities and would provide them an "equal opportunity to use and enjoy" housing. (Dkt. No. 19-1, at 30–32). Plaintiffs oppose dismissal arguing that "all repairs recommended by plaintiff's structural engineer were in fact repaired," as "verified" by the City's building inspector, and that their request that Defendant "accept the engineer's reports of the fire escape" "was reasonable and would bear no expense on defendant." (Dkt. No. 58, ¶ 63; Dkt. No. 44-3, at 12–13).

"In order to prove a failure-to-accommodate claim, a plaintiff must show (1) that the plaintiff or a person who would live with the plaintiff had a handicap within the meaning of § 3602(h); (2) that the defendant knew or reasonably should have been expected to know of the handicap; (3) that the accommodation was likely necessary to afford the handicapped person an equal opportunity to use and enjoy the dwelling; (4) that the accommodation requested was reasonable; and (5) that the defendant refused to make the requested accommodation." *Olsen v. Stark Homes, Inc.*, 759 F.3d 140, 156 (2d Cir. 2014).

---

[9] To the extent Plaintiffs seek to proceed on a comparator-based disparate treatment claim, the Court notes that the Amended Complaint fails to identify any similarly situated property that was treated differently by the City. The sole allegation that arguably asserts such a claim is the allegation that at the March 20, 2023, Planning Board meeting, the Planning Board "held a hearing for another individual that was renewing a special use permit" and "renewed this person's special use permit for a period of five years with very little discussion." (Dkt. No. 58, ¶ 38). However, the absence of factual details precludes the Court from drawing any inferences or comparisons.

[10] The Amended Complaint asserts the reasonable accommodation claim under the ADA only. (*Id.* ¶¶ 79–83).

Here, Plaintiffs request that the City "accept the multiple reports from their engineer showing that the fire escape was not in an unsafe condition, as a reasonable accommodation to continue operate [sic] the Group Home." (Dkt. No. 58, ¶ 67.c). However, as alleged, there is no view of this allegation that would allow the inference that the City's waiver of a fire safety requirement was likely necessary to afford Plaintiffs an equal opportunity to use and enjoy Chestnut Hill. Indeed, Plaintiffs do not argue or provide facts showing that this request was related to their disabilities. The allegations indicate that Plaintiffs sought the waiver as they had otherwise failed to provide the certification the Planning Board was requiring. (*Id.* ¶ 55). "The duty to make reasonable accommodations is framed by the nature of the particular handicap." *Salute v. Stratford Greens Garden Apartments*, 136 F.3d 293, 301 (2d Cir. 1998). Plaintiffs fail to allege facts showing how their disabilities, which include mental health impairments and mental challenges prevent them from enjoying Chestnut Hill, and how waiver of a fire safety requirement could "compensate for the diminished use caused by these disabilities." *Monterroso v. City of New York*, No. 22-cv-7142, 2024 WL 360816, at *5, 2024 U.S. Dist. LEXIS 16889, at *14 (S.D.N.Y. Jan. 31, 2024) (dismissing FHA reasonable accommodation claims where the plaintiff's requests, including a cemented side yard, front stairs close to sidewalk, and no space for a generator, are "unrelated to her disabilities," explaining that the "allegations, though identifying features of the home that are not to Plaintiff's liking, fail to explain how Plaintiff's handicaps prevent her enjoyment of the home, and how reasonable accommodations could compensate for the diminished use caused by these disabilities")[11]; *see also*, *e.g.*, *Perricone-Bernovich v. Tohill*, 843 F. App'x 419, 421 (2d Cir. 2021) (finding complaint failed to state

---

[11] "Due to the similarities between the statutes, courts apply a similar analysis to reasonable accommodation claims under" the FHA and ADA. *Pinckney v. Carroll*, No. 18-cv-12198, 2019 WL 6619484, at *6, 2019 U.S. Dist. LEXIS 209835, at *16 (S.D.N.Y. Dec. 4, 2019).

reasonable accommodation claim where the plaintiff "did not argue that her requests were related to her disabilities" but asserted that "she wanted permission to build closer to the road than the Village usually allowed to accommodate features like a three-car garage used to store an antique car, and she preferred the selected lot because it was conveniently located and relatively inexpensive"). Accordingly, Defendant's motion to dismiss Plaintiffs' FHA and ADA reasonable accommodation claim is granted.

### 3.     Fourteenth Amendment Substantive Due Process

Defendant moves for dismissal of Plaintiffs' Fourteenth Amendment substantive due process claim. (Dkt. No. 48, at 2). Plaintiffs oppose dismissal. (Dkt. No. 49).

As relevant here, to state a claim for violation of substantive due process, a plaintiff must allege facts to show: 1) a "valid property interest in a constitutionally-protected benefit"; and 2) deprivation of that interest in a manner that is "arbitrary," "conscience-shocking," or "oppressive in the constitutional sense." *Doe v. Zucker*, 520 F. Supp. 3d 217, 258 (N.D.N.Y. 2021) (cleaned up); *see also Hurd v. Fredenburgh*, 984 F.3d 1075, 1088 (2d Cir. 2021) (noting that state-created rights are generally not recognized under the substantive due process clause unless they "trigger core constitutional interests").

Here, Plaintiffs allege that they have a "vested property interest in the special use permit that was granted, then revoked by Defendant." (Dkt. No. 58, ¶ 85). To establish a "valid property interest," Plaintiff must allege facts showing a clear entitlement to the renewal of the special use permit. *Natale v. Town of Ridgefield*, 170 F.3d 258, 263 (2d Cir. 1999) (explaining plaintiff was first required to demonstrate a "clear entitlement to the permit under state law" to prove that the denial of her permit deprived her of her substantive due process rights). "Usually, entitlement turns on whether the issuing authority lacks discretion to deny the permit, i.e., is required to issue it upon ascertainment that certain objectively ascertainable criteria have been met." *Id.*; *Dean v.*

*Town of Hempstead*, 527 F. Supp. 3d 347, 423 (E.D.N.Y. 2021) (determining "whether an administrative framework yields a 'legitimate claim of entitlement'" requires courts to "consider 'whether the statutes and regulations governing the distribution of benefits meaningfully channel[ ] official discretion by mandating a defined administrative outcome.'" (quoting *Barrows v. Burwell*, 777 F.3d 106, 113 (2d Cir. 2015)).

Section 405-32 of the Kingston City Code,[12] which governs special permits, provides, in relevant part that "the Planning Board *may* authorize, by resolution, the issuance of a special permit" and that in authorizing the issuance of such a permit, the Planning Board shall "take into consideration the public health, safety and welfare and shall prescribe *appropriate conditions and safeguards* to insure the accomplishment of" the specified objectives. Kingston City Code § 405-32 (emphasis added); *see also* Dkt. No. 52-4 (Kingston City Code § 405-32). The City Code specifies, among others, the following objectives: that all proposed structures "be readily accessible for fire and police protection" and that "the proposed use is of such location, size and character that, in general, it will be in harmony with the appropriate and orderly development of the district in which it is proposed to be situated and will not be detrimental to the orderly development of adjacent properties." *Id.* § 405-32(A)(1)–(2). The City Code further provides that "in authorizing the issuance of a special permit, it shall be the duty of the Planning Board to attach such conditions and safeguards as may be required in order that the results of its action may . . . further the general objective of this chapter." *Id.* § 405-32(D). Regarding renewal, § 405-32 states: "The Board may require that special permits be periodically renewed. Such

---

[12] Under Federal Rule of Evidence 201, the Court may take judicial notice of the relevant provisions of the Kingston City Code. Fed. R. Civ. P. 201(b)(2) ("The court may judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."); *see also Soundview Assocs. v. Town of Riverhead*, 725 F. Supp. 2d 320, 337 n.4 (E.D.N.Y. 2010) (taking judicial notice of Riverhead Town Code on motion to dismiss (citing Fed. R. Evid. 201)); *Nelson v. City of Rochester*, 492 F. Supp. 2d 282, 284 (W.D.N.Y. 2007) (taking judicial notice of Rochester Municipal Code).

renewal shall be granted following due public notice and hearings and may be withheld only upon a determination that such conditions as may have been prescribed by the Board in conjunction with the issuance of the original permit have not been, or are no longer being, complied with." *Id.*

Thus, the Planning Board had discretion to (1) prescribe appropriate conditions and safeguards to any special permit it issued; (2) require periodic renewal; and (3) deny renewal "upon a determination" that the conditions it prescribed "have not been, or are no longer being, complied with." Kingston City Code § 405-32. Thus, because the Planning Board had discretion to withhold renewal if it determined the conditions it specified in Chestnut Hill's Special Use Permit were not, or were "no longer being, complied with," such discretion deprived Chestnut Hill of a property interest in the permit. *RRI Realty Corp. v. Inc. Vill. of Southampton*, 870 F.2d 911, 919 (2d Cir. 1989) (finding the review board's "discretion to deny the permit during the thirty-day interval deprived [the plaintiff] of a property interest in the permit"); *see also Dean*, 527 F. Supp. 3d at 424–25 ("Plaintiffs were not constitutionally deprived of the variances and permits because they did not meet the Town's requirements for receiving approvals and, even if they did, the Board and Department of Buildings have discretion to deny Plaintiffs' applications."); *Cunney v. Bd. of Trustees of Vill. of Grand View*, 56 F. Supp. 3d 470, 497–99 (S.D.N.Y. 2014) (explaining that although the village zoning law stated the that the building inspector "shall issue" a certificate of occupancy after finding compliance, the zoning law also gave the building inspector "discretion to make a determination of conformity or non-conformity," and finding that the "degree of discretion" the building inspector possessed in determining conformity was "sufficient to defeat Plaintiff's property interest in the" certificate of occupancy). Given the discretion the Planning Board possessed in determining the conditions to

which a special use permit were subject, and in determining whether the applicant for renewal

had met, or was no longer meeting those conditions, Plaintiffs fail to allege a clear entitlement to

renewal of the special use permit. *See Clubside, Inc. v. Valentin*, 468 F.3d 144, 154 (2d Cir.

2006) (explaining that the clear entitlement analysis "turns on the degree to which state and local

law unambiguously limits the Board's discretion"). Nothing in the Code governing the Planning

Board's issuance of special permits limits the conditions "as may have been prescribed by the

Board" or specifies how the Board is to determine compliance with conditions. Such discretion is

inconsistent with a constitutional property interest. Thus, Plaintiffs fail to allege a violation of

their substantive due process rights. Accordingly, Defendant's motion to dismiss Plaintiff's

substantive due process claim is granted.

## IV.    MOTION FOR A PRELIMINARY INJUNCTION

On August 27, 2023, Plaintiffs filed their first motion for a temporary restraining order

("TRO") and preliminary injunction. (Dkt. No. 5). On August 31, 2023, the Court held a

telephone conference with the parties, set a briefing schedule, and scheduled an evidentiary

hearing. The motion was fully briefed, (Dkt. Nos. 9, 19, 21, 24). The parties filed witness and

exhibit lists. (Dkt. Nos. 27–29). On September 20, 2023, the Court held an evidentiary hearing at

which four witnesses testified and the parties made opening and closing statements. (*See* Text

Minute Entry filed Sep. 20, 2023). The Court denied Plaintiffs' request for a TRO at the close of

the hearing, and on October 13, 2023, issued a Memorandum-Decision and Order denying

Plaintiff's motion for a preliminary injunction. (Dkt. No. 42).

On October 20, 2023, Plaintiffs, who obtained new counsel after the evidentiary hearing,

(Dkt. No. 34 (Notice of Appearance by Thomas J. Minotti filed Sep. 27, 2023)), filed an

amended complaint asserting, in addition to FHA and ADA claims, a Fourteenth Amendment

substantive due process claim, (Dkt. No. 58), and a second motion for a TRO and preliminary

injunction, (Dkt. No. 44). The second motion differs little from the first, except that it was crafted by different counsel and seeks relief with respect to the newly asserted substantive due process claim. To the evidentiary record, the second motion adds a new affidavit from Sangiovanni, (Dkt. No. 44-2, at 2–5), email exchanges between counsel, (*id.* at 9), and a new affidavit by John Stinemire, P.E., (*id.* at 60–61).[13]

The Court has reviewed the "new" evidence Plaintiffs submitted but finds Plaintiffs' second motion for a preliminary injunction fails for all the same reason their first motion failed: they fail to show a likelihood of success on their FHA and ADA discrimination and reasonable accommodation claims. Moreover, as the Court has granted Defendant's motion to dismiss the Fourteenth Amendment substantive due process claim, Plaintiffs' motion for a preliminary injunction as to their substantive due process claim is denied as moot.

## V.     AMENDED COMPLAINT

Plaintiffs recently filed a letter stating their intent to file an amended complaint. (Dkt. No. 59). As Plaintiffs have already filed an amended complaint as of course, and do not appear to have Defendant's consent, Plaintiffs must obtain the Court's leave. Fed. R. Civ.  P. 15(a). Any motion to amend the complaint must be filed within thirty (30) days of the date of this Order and must comply with Local Rule 15.1.

## VI.     CONCLUSION

For these reasons, it is hereby

---

[13] In the affidavit, dated October 17, 2023, Stinemire states: that he performs "eight to ten fire escape inspections within the City of Kingston" annually; that once the items in his inspection reports are repaired, "the fire escape meets the standards of the New York State Code with respect to fire escapes"; that the language he used in the Chestnut Hill May 24, 2023, inspection report is "the exact same language" he includes "in every fire escape inspection report that [he has] written"; and that to his "knowledge, no other fire escape inspection reports" he provided "with respect to properties within the City of Kingston have been rejected by the City for not being compliant with the New York State Code for fire escape inspections." (Dkt. No. 44-2, at 60–61). Stinemire's affidavit provides no factual details concerning his other fire escape inspections such as the types of fire escapes, whether they involved residences or commercial properties, or whether they were governed by the same provision of the Fire Code at issue in this case.

**ORDERED** that Defendant's motion to dismiss (Dkt. No. 19) the Amended Complaint is granted as to the ADA reasonable accommodation claim and the Fourteenth Amendment substantive due process claim; and it is further

**ORDERED** that Plaintiffs' ADA reasonable accommodation claim and Fourteenth Amendment substantive due process claim are **DISMISSED**; and it is further

**ORDERED** that Defendants' motion to dismiss (Dkt. No. 19) is otherwise **DENIED** in its entirety; and it is further

**ORDERED** that Plaintiffs' motion for a preliminary injunction (Dkt. No. 44) is **DENIED**; and it is further

**ORDERED** that an motion to amend the complaint must be filed within thirty (30) days of the date of this Order.

**IT IS SO ORDERED.**

Dated: July 15, 2024
        Syracuse, New York

Brenda K. Sannes
Chief U.S. District Judge