**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

CHESTNUT HILL NY, INC., THOMAS RIKER, JOHN
STURM, and JAE CURTIS,

                            Plaintiffs,

1:23-cv-01024 (BKS/DJS)

v.

CITY OF KINGSTON,

                            Defendant.

_____

**Appearances:**

_For Plaintiffs:_
William A. Hurst
Hurst Law Firm PLLC
439 Delaware Avenue, PMB 116
Delmar, New York 12054

_For Defendant:_
Barbara Graves-Poller
City of Kingston Corporation Counsel
Matthew M. Jankowski
Assistant Corporation Counsel
420 Broadway
Kingston, New York 12443

**Hon. Brenda K. Sannes, Chief United States District Judge:**

**MEMORANDUM-DECISION AND ORDER**

## I.      INTRODUCTION

Plaintiffs Chestnut Hill NY, Inc., Thomas Riker, John Sturm, and Jae Curtis bring this

action alleging discrimination was a motivating factor in the Defendant City of Kingston's denial

of a Special Use Permit for the operation a group home for the disabled. (Dkt. No. 58). Plaintiffs

assert disparate treatment claims under the Fair Housing Act ("FHA"), 42 U.S.C. §§ 3604, et

seq. and Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12131, et seq.

(*Id.*). Presently before the Court is Defendant's motion for summary judgment under Federal Rule of Civil Procedure 56. (Dkt. No. 89). The motion is fully briefed. (Dkt. Nos. 92, 95). For the reasons that follow, Defendant's motion is granted.

## II.    FACTS[1]

### A.    The Parties

Since 2014, Chestnut Hill NY, Inc. has operated "Chestnut Hill," a boarding house at 106 West Chestnut Street in the City of Kingston, as "a group home for disabled people." (Dkt. No. 89-2, at 15). According to Joseph Sangiovanni, the president and chief executive officer of Chestnut Hill NY, Inc., the residence is a "fourteen (14) bedroom 1860's-era converted mansion (three stories) with an accessory residential cottage." (Dkt. No. 92-1, ¶ 1). Chestnut Hill "provides long-term, stable housing for indigent individuals, including those with disabilities," those recovering from medical procedures, the elderly, and the terminally ill. (*Id.* ¶¶ 2–3). Sangiovanni states that the residents operate like a "family unit—they plan meals together, shop together, [and] pool their limited public benefits together for shared items," as well as "do their own laundry, dishes, and housekeeping." (*Id.* ¶ 5). Sangiovanni states that "[a]t its peak in 2023, Chestnut Hill provided a safe space and sober living environment to as many as fifty-six (56) clients." (*Id.* ¶ 3).

Plaintiff Thomas Riker lived at Chestnut Hill from 2019 until June 1, 2024. (Dkt. No. 89-8, ¶ 3; Dkt. No. 92-11, ¶ 3; Dkt. No. 89-3, at 8). Plaintiff John Sturm has lived at Chestnut Hill for approximately ten years. (Dkt. No. 89-8, ¶ 3; Dkt. No. 92-11, ¶ 3; Dkt. No. 89-4, at 12).

---

[1] The facts are drawn from Defendant's Statement of Undisputed Material Facts, (Dkt. No. 89-8), and Plaintiffs' Response to Defendant's Statement of Material Facts, (Dkt. No. 92-11), to the extent the facts are well-supported by pinpoint citations to the record, as well as the exhibits attached thereto and cited therein. Certain background facts regarding the parties' prior litigation over the operation of the property at issue are drawn from *Chestnut Hill NY, Inc. v. City of Kingston ("Chestnut Hill I")*, No. 17-cv-0095 (N.D.N.Y. filed Jan. 27, 2017). The facts are construed in the light most favorable to Plaintiffs as the non-moving party. *Gilles v. Repicky*, 511 F.3d 239, 243 (2d Cir. 2007).

Plaintiff Jae Curtis lived at Chestnut Hill from 2020 until September or October 2024. (Dkt. No. 89-8, ¶ 3; Dkt. No. 92-11, ¶ 3; Dkt. No. 89-5, at 9–10).[2]

Defendant "City of Kingston is a municipality within the State of New York." (Dkt. No. 89-8, ¶ 4; Dkt. No. 92-11, ¶ 4). Wayne D. Platte Jr. has been the Chair of the Kingston Planning Board since approximately 2010. (Dkt. No. 92-9, at 11). The Planning Board has "five voting members and a number of alternate voters." (Dkt. No. 92-9, at 13). Suzanne Cahill is the Kingston City Planner. (Dkt. No. 92-9, at 15–16). Stephan Knox is the Kingston Code Enforcement/Building Safety Officer and "oversees the Kingston Department of Building & Safety which enforces local and state building codes, including the New York State Uniform Fire Prevention and Building Code." (Dkt. No. 89-8, ¶ 5; Dkt. No. 92-11, ¶ 5).

### B.    Background

#### 1.    *Chestnut Hill I* and Special Use Permit

Chestnut Hill's operation of a boarding house as a group home for disabled people in the City of Kingston was the subject of a prior action in this Court, *Chestnut Hill NY, Inc. v. City of Kingston ("Chestnut Hill I")*, No. 17-cv-0095 (N.D.N.Y. filed Feb. 22, 2017). The following is a brief outline of the events leading to *Chestnut Hill I*, to the extent they are relevant here.[3]

According to the complaint in *Chestnut Hill I*, the residence at 106 West Chestnut Street has operated as a "boarding house for ill or disabled persons since the 1950s." *Chestnut Hill I*, Dkt. No. 1, ¶ 14. Chestnut Hill NY, Inc. began leasing (and Sangiovanni began managing) the residence in 2014. *Id.* Dkt. No. 1, ¶ 10. According to Sangiovanni, although 106 West Chestnut

---

[2] The Amended Complaint describes Riker, Sturm, and Curtis as "qualified individual[s] with a disability." (Dkt. No. 58, ¶¶ 6–8). That the residents of Chestnut Hill are disabled within the meaning of the FHA and ADA is not disputed in this case.

[3] For a more complete recitation of these events, *see Chestnut Hill NY, Inc. v. City of Kingston ("Chestnut Hill II")*, No. 23-cv-01024, 2023 WL 6796622, at *2–13, 2023 U.S. Dist. LEXIS 184157, at *3–8 (N.D.N.Y. Oct. 13, 2023).

Street was located in an R-1 zoning district, where boarding houses were not a permissible use, since the residence's use as a boarding house predated "the 1963 enactment of zoning in the City," it was a permissible "non-conforming use." *Id.* Dkt. No. 1, ¶ 13. However, in 2014, when Chestnut Hill applied to the City's Building and Safety Department for a building permit to relocate a kitchen sink, the City responded by challenging Chestnut Hill's status as "non-conforming use." *Id.* The Building and Safety Department eventually denied the building permit on the ground that the boarding house was "not a non-conforming use and was not a permitted use in a R-1 [residential] District." *Id.* Dkt. No. 1, ¶ 18. Chestnut Hill appealed to the City's Zoning Board of Appeals, which held a series of public hearings, where several residents "expressed hostile and biased attitudes toward the continued operation of a home for the disabled," and two Article 78 proceedings. *Id.* Dkt. No. 1, ¶¶ 19–21. Chestnut Hill did not prevail and on December 27, 2016, the Building Safety Division informed Chestnut Hill that its residents would have to vacate the building within thirty days. *Id.* Dkt. No. 1, ¶ 22.

In early 2017, Chestnut Hill filed *Chestnut Hill I*, alleging, inter alia, disability discrimination in violation of the FHA and ADA, and sought a temporary restraining order ("TRO") and preliminary injunction prohibiting the closure of Chestnut Hill and the removal of its residents. *Chestnut Hill I*, Dkt. Nos. 1, 5. The Court granted Plaintiffs' motion for a TRO and scheduled an evidentiary hearing on the motion for a preliminary injunction. *Id.* Dkt. No. 19. Following the hearing, the parties began discussing settlement, including whether Chestnut Hill could apply to the City for a variance. *Id.* Dkt. No. 43. These discussions continued for more than two years, during which time the TRO remained in place. *See, e.g.*, *id.* Dkt. No. 73 (Text Order entered on July 18, 2019, continuing TRO). Eventually, the Zoning Board of Appeals granted Chestnut Hill a variance allowing it to continue "to operate a boarding home in

accordance with the special permit provisions applicable in an R-2 zone, on such terms and conditions as approved by the Planning Board."[4] (Dkt. No. 19-41, at 2–3).

On November 28, 2018, Chestnut Hill applied to the City Planning Board for a Special Use Permit and Site Plan Approval to operate "a 39 bed Boarding Home providing room and board and temporary shelter services to residents of the community." (Dkt. No. 19-42, at 2, 5). Chestnut Hill sought a "variance/waiver" of code provisions "limiting borders [sic] to 12 and rooms to 10," "limiting rooms to 2 occupants," and "barring 3rd floor occupancy." (*Id.* at 2). Chestnut Hill also sought a waiver of the requirement that "the operator . . . keep a register of residents subject to Police, Fire Department and Building Department Inspection upon demand,"

---

[4] The Resolution provides, in relevant part:

> The applicable zoning regulations and restrictions have caused an undue hardship on the property owner; that the property owner cannot realize a reasonable return in using the premises for any of the of right uses set forth in an R-1 zone; that the hardship established to this Board is unique and not applicable to a substantial portion of the neighborhood and that the hardship was not self-created.
>
> The variance granted herein is the minimum that is required to address the undue hardship.
>
> The premises have been operated as a boarding home for an extended period of time as set forth in the documentary evidence introduced as part of the record.
>
> Insofar as the current long-standing use as a boarding home has been established, the continued operation within the existing parameters cannot be considered as producing any undesirable change to the character of the neighborhood and granting the variance will not create any detriment.
>
> . . .
>
> NOW, based on the above findings of fact, it is hereby
>
> RESOLVED, that the requested use and area variances are granted as herein modified.
>
> The applicant is granted a use variance to operate a boarding home in accordance with the special permit provisions applicable in an R-2 zone, on such terms and conditions as approved by the Planning Board.
>
> The applicant is further granted a variance from such requirements set forth in section 405-12(B)(2) and section 405-12(aa), as deemed appropriate by the Planning Board in its consideration and determination regarding the application for a special permit.

(Dkt. No. 19-41, at 2–3).

explaining that "a register open to public scrutiny denies these vulnerable residents their privacy and will discourage them from benefitting from applicant's housing." (*Id.*). On April 15, 2019, the Planning Board granted Chestnut Hill's application and issued an annually renewable Special Use Permit and Site Plan Approval, enabling Chestnut Hill to operate legally.[5] (Dkt. No. 19-43). On September 5, 2019, *Chestnut Hill I* was dismissed by reason of settlement. *Chestnut Hill I*, Dkt. No. 74.

### 2.    Renewal of Special Use Permit – 2020, 2021, 2022

In 2020 and 2021, the Planning Board renewed the Special Use Permit "without incident." (Dkt. No. 92-1, ¶ 27). On October 21, 2021, Knox conducted a building inspection and cited Chestnut Hill for fire code violations including the following:

> Fire alarm system not functioning;
> Missing carbon monoxide detectors on the 2nd and 3rd floors;
> No fire extinguishers in rooms 6 & 10;
> The fire extinguisher in the Kitchen was not functioning;
> The electrical outlet by the stove needed to be stabilized;
> A NYS Boiler inspection needed to be completed;
> No smoke detector and carbon monoxide detector in the basement;
> No carbon monoxide detector in the cottage; and
> The Fire Escape needed to be examined for structural adequacy and
> safety in accordance with Uniform Code § 1104.16.5.1.

(Dkt. No. 89-8, ¶ 21; Dkt. No. 92-11, ¶ 21; *see also* Dkt. No. 19-24 (Violation Noice and Order to Remedy)).

---

[5] The Planning Board resolution that granted the Special Use Permit "imposed a variety of conditions including regular inspections at a minimum of once per year for permit renewal, and occupancy limits in compliance with State Building Codes including the Multiple Dwelling Code." (Dkt. No. 58, ¶ 29; Dkt. No. 19-43). The resolution further stated that the conditions "upon renewal may be expanded on after consideration by the Board and with cause," including that the owner reside in the City of Kingston, occupancy limits comply with all codes and local rules, there be no portable heating units, all cooking and food must be in the kitchen and in no other room, the owner must provide and change linens weekly, garbage must be deposited in suitable covered receptacles, all sleeping rooms be numbered, every floor be equipped with a fire extinguisher, inspections by the Building Department be conducted once per year and additional inspections may be required, and "[s]aid use shall conform and be maintained in harmony with the overall character and appearance of the surrounding neighborhood." (Dkt. No. 19-43, at 4).

On November 4, 2021, John Stinemire, P.E., Consulting Engineer, conducted a "condition inspection of the exterior steel fire escape at 106 West Chestnut Street," and issued a report with the following findings and recommendations: a tread had "been partially cut compromising its integrity"; the foundations for "several of the steel angle supports" were "set below grade" and thus not only prohibited visual inspection but should not "be in direct contact with the soil as the steel will corrode and eventually fail"; a "concrete foundation pier" had "deteriorated to [sic] point where it is not structurally sound" and required a new concrete pier that extended four feet "below grade for frost protection"; a "diagonal steel bracing member" had been "cut and removed" and "should be replaced with new members of equal size and welded in place."[6] (Dkt. No. 92-6, at 4–5). "Due to the weather and cold, Sangiovanni could not fix the concrete footing and got a building permit" with a one-year term. (Dkt. No. 89-8, ¶ 24; Dkt. No. 92-11, ¶ 24).

On February 22, 2022, the Planning Board considered Chestnut Hill's annual application to renew the Special Use Permit. (Dkt. No. 92-7, at 2). Chair Platte "noted the comments which were received and circulated to the Board," and that "some including trespass and illegal substance use are police matters."[7] (*Id.*). The Planning Board and Sangiovanni discussed trash issues, the outstanding building permits, and the "Building Safety Inspection." (*Id.*). Sangiovanni explained that there were "some minor items to be addressed with the fire escape but that those cannot be done until the better weather." (*Id.*). The Planning Board "voted unanimously . . . to approve the special permit for a period of 1 year, expiring on February 22, 2023." (*Id.*).

---

[6] Stinemire further stated: "This is a condition inspection only and does not include any comments, representations or conclusion regarding the design, analysis, load capacity or overall design or suitability of the subject fire escapes." (Dkt. No. 92-6, at 5).

[7] The parties do not indicate whether these comments are in the present record and, upon review, they do not appear to be.

### C.    2023 Application for Renewal of Special Use Permit

On or about "January 23, 2023, [the City] notified [Chestnut Hill] that its special permit was going to expire on February 23, 2023." (Dkt. No. 89-8, ¶ 25; Dkt. No. 92-11, ¶ 25). "Chestnut Hill requested and was given additional time to submit its renewal application to the Planning Board." (Dkt. No. 89-8, ¶ 25; Dkt. No. 92-11, ¶ 25).

On March 17, 2023, the Kingston Fire Department responded to an "unattended" death at Chestnut Hill. (Dkt. No. 89-8, ¶ 26; Dkt. No. 19-60). Plaintiffs dispute the "characterize[ation]" of the death as "unattended," [8] (Dkt. No. 92-11, ¶ 26), and assert that the individual "died in his home, where he lived together with several other residents," (Dkt. No. 92-1, ¶ 32). According to Sangiovanni, the individual was an elderly resident who "came to us in recovery from open heart surgery and . . . died during his convalescence." (*Id.*).

### 1.    First Planning Board Meeting

On March 20, 2023, the Planning Board held a public hearing on Chestnut Hill's Special Use Permit renewal application. (Dkt. No. 89-8, ¶ 27; Dkt. No. 19-11 (Public Hearing Transcript); *see also* Dkt. No. 92-7, at 4–6 (Meeting Minutes)). Six members of the public spoke at the hearing and, according to the meeting minutes, made the following statements:

> Individual 1: Spoke about problems and concerns with regard to noise, police incidents, disturbances to the neighborhood.
>
> Individual 2: Does not object to boarding houses as type of housing. Objects to the manner in which the property is managed, not following the laws. There is a housing and a mental health issue but this place only provides housing. The website says that it is a sober living environment but syringes and alcohol bottles are found on the property and surrounding properties. Death in the house just this past weekend, an overdose. Who is the on-site manager? Is the fire-escape legal, handicap access? Annual inspections done? By whom? What are the maximum numbers?

---

[8] The parties' dispute regarding the description of the death as "unattended" is immaterial.

Individual 3: The Board should deny the application . . . . Will they be required to follow any new code requirements? Understands there is an inspection coming up, wait for that. The Planning Board should be working with Social Services to find suitable homes. This building should be required to be in compliance with the zoning code.

Individual 4: [Resides at] 203 West Chestnut Street - Owned property for 27 years. Has a daughter that lives on Orchard Street a few houses away from 106 West Chestnut Street. Has seen several people coming out of the house staggering and unable to stand, definitely on drugs. Her son in law's truck was broken into and a neighbor found a resident from this house sleeping in their car. She also found a hypodermic needle while walking her dog. Had a client that was in the building, asked why he left and said it was the conditions and residents being housed, not comfortable or safe.

Individual 5: [Resides at] 203 West Chestnut Street- Said that he grew up in this house and that his parents operated a nursing home there. He and his wife have had their house as a rental property in the neighborhood for years and decided recently to move back into the home. When he operated the rental property, there were rules that he and his tenants needed to follow. Why is this property able to operate without abiding by rules? He would be fined if he ran a rental property this way. He has a daughter living close to this house and now is going to have a grandchild living here. He is very concerned about what goes on there. Population far exceeds the limits of the code. Can you picture yourself living there?

Individual 6: Is a concerned citizen who lives in the neighborhood. Why were the rules in the zoning code not followed? This property should have to conform to the requirements. There is trash in the yard, things have been taken from houses, need to feel safer.

(Dkt. No. 92-7, at 4–5). Sangiovanni spoke last, refuting the complaints. (Dkt. No. 19-11, at 14–17). At that point, Cahill, the City Planner, noted there was a building inspection "coming up very shortly" and advised Sangiovanni that she "did reach out to the police chief . . . to discuss . . . the events of this past weekend . . . a death" and that the police chief had told her "it was an OD." (*Id.* at 17). Cahill stated she recognized that "[i]t does happen . . . in every neighborhood" but that she and the police chief also spoke" about the number of calls and the types of calls . . .

over the past year," noted that the calls had been "generated from" neighbors, Sangiovanni, and

residents, and stated that she had a "couple of questions." (*Id.* at 18). Cahill confirmed that there

was an individual living at "the site," available "24-7 to manage the site," and asked whether

Chestnut Hill was conducting "random testing," as indicated in Chestnut Hill's rules and

regulations. (*Id.* at 19; Dkt. No. 92-7, at 5). Sangiovanni replied that "that there has not been

random drug testing." (Dkt. No. 92-7, at 5). The minutes reflect that the Planning Board

discussed the fire escape and Sangiovanni responded that "he needed to hire a structural engineer

to review the fire escape" but that there were no structural issues. (*Id.*). After being advised that

an inspection of Chestnut Hill was scheduled for March 22, 2023, the Planning Board voted to

table the application to allow for additional time. (*Id.* at 6).

## 2.    Department of Building and Safety Inspections

On March 22, 2023, Knox conducted a building inspection of Chestnut Hill, "a

requirement of [the] special permit to operate," (Dkt. No. 19-29, at 2), and "noted multiple

violations," (Dkt. No. 89-8, ¶ 29; Dkt. No. 92-11, ¶ 28), including an unpermitted "[b]edroom in

[the] basement," (Dkt. No. 19-29, at 2), and the following:

> Fire extinguishers throughout the building are un-tagged;
> Extinguishers in the kitchen area had tags that indicated they expired
> in 2017;
> Basement bedroom egress window had sheetrock placed over it,
> needs to be uncovered as an emergency means of egress;
> Report needed for fire alarm system;
> Report needed from engineer for fire escape."

(Dkt. No. 89-8, ¶ 29; Dkt. No. 92-11, ¶ 28; *see also* Dkt. No. 19-28, at 4–5 (Inspection signed by

Knox)). In an April 12, 2023, follow-up letter, Knox wrote that the noted "violations" were "in

need of correction" and that the property would be reinspected and reminded Sangiovanni that

the permit for "repairs to the fire escape can be closed out as soon as we receive the final letter

from your engineer." (Dkt. No. 19-29, at 2).

Following reinspection on April 17, 2023, Knox advised Cahill via email that "[a]ll of the smaller items have been corrected and the beds we required be removed in the rear cottage and basement were gone." (Dkt. No. 92-7, at 7). Knox stated although the fire alarm system was not working, it was not "required at the time of construction" and that "Code requires that non-required systems be maintained" or "removed or have no visible signs of an installed system," and that visible parts of the system would "temporarily be covered until Fisher Alarms restores the system to full working order."[9] (*Id.*). Knox further stated that that "fire escape repairs have been made and John Stinemire will be there April 25 . . . to do his follow-up inspection."[10] (*Id.*). Knox informed Cahill that he was "willing to issue a 30–45 day operating permit at this point." (*Id.*). Cahill forwarded Knox's email to Chair Platte and Corporation Counsel, among others, and wrote: "FYI from Steve. I am still of the opinion that we hold off. Items do not seem to be covered yet (can't confirm) and no time frame for removal. Also, other inspection needed." (*Id.*).

### 3. Second Planning Board Meeting

The Planning Board met the same day, April 17, 2023. (Dkt. No. 19-12, at 2). Chair Platte noted that the Board was "waiting on some items . . . before we can make a determination," including the "engineer's structural report" on the fire escape. (*Id.* at 3). Cahill noted that at the March meeting, the Board "listened to public comment," and that since then, the Board had received the Building Safety Division's April 12 report flagging the fire escape repairs, need for fire alarm system to be tested and inspected, the presence of a bedroom in the basement and a bed in the rear cottage that required removal. (*Id.* at 2–4). Cahill reported that she had received an email from Knox regarding the Building Safety Division follow-up inspection,

---

[9] Sangiovanni avers that in May 2023, just days after "a brand-new demand," he got "the old [fire alarm] system operational." (Dkt. No. 92-1, ¶ 43).

[10] Stinemire's inspection appears to have occurred on April 26, 2023. (Dkt. No. 92-6, at 11). The date is immaterial.

who indicated that as a "non-required system," the fire alarm system could be "maintained" or removed," and Chestnut Hill planned to restore the system to working order, and that the "engineer for the . . . fire escape is scheduled to be there on the 25th of April," which was before the Board's next meeting. (*Id.* at 7–8). Cahill proposed that since "[a]ll of the items are not completed, so at this time it's our recommendation that no determination" on the special permit application be made "until all of the issues are fully addressed to the satisfaction of the City." (*Id.* at 4). When Cahill asked the Board whether there were other questions "that [it] want[ed] [her] to follow up with the applicant on," Board Member Matthew Gillis asked about the management of Chestnut Hill and whether it was "full time on site" because "you look at the number of police complaints and all of the issues there." (*Id.* at 5–6). Cahill responded that there was "one person on site" but that there was no "requirement in the code in terms of how many management positions need to be in place for any number of people." (*Id.* at 6). The Board voted to table the application until the work on the fire alarm system was complete and Stinemire had completed his inspection. (Dkt. No. 89-8, ¶ 31; Dkt. No. 19-12, at 2–7).

### 4. Engineer's Inspection of Fire Escape

On April 26, 2023, Stinemire inspected the exterior steel fire escape at Chestnut Hill and noted the following:

> One of the diagonal bracing components for the fire escape has been cut 90% through the member. This bracing member will need to be removed and replaced with a member of the same size and shape. . . .
>
> One horizontal railing component at the upper-level landing is not securely fastened to the building. All railing components need to be securely attached so that they do not move. Wood blocking needs to be installed in the exterior to allow for a secure connection.

(Dkt. No. 92-6, at 11).

### 5. Fire Department's Request for Inspection

On May 13, 2023, after "a resident of the boarding house made a complaint,"[11] the

Kingston Fire Department sent a request for inspection to the Department of Building and

Safety, (Dkt. No. 19-22, ¶ 22), citing "[i]llegal apts in basement, egress stairwell blocked, [and]

unsafe stove in basement to free clothes of bedbugs," (Dkt. No. 19-31, at 2; *see* Dkt. No. 89-8, ¶

35). Upon arrival, the building inspector noted that "the bags of clothes reported to have been

clocking the egress/exit door from the basement had been removed," but that there was "a

hammock hanging up near the door" and that the "unsafe stove . . . was present in a closet in the

basement." (Dkt. No. 19-31, at 2). The inspector directed the removal of the hammock, which

was removed, and that the stove be removed. (*Id.*). "[F]or the time being the circuit which

powered the stove has been turned off and the wire that powered the stove was snipped." (*Id.*).

### 6. Third Planning Board Meeting

At the May 15, 2023, Planning Board meeting, Cahill advised Sangiovanni that there

were several outstanding items regarding the special permit application that were required to be

submitted by May 31, 2023: a structural report from Stinemire or another certified structural

engineer, confirmation that Chestnut Hill was following "all the items in the original approval,"

the name and contact information of the site manager, and confirmation that the "maximum

occupancy is 38 persons." (Dkt. No. 19-13, at 24–26). Chair Platte noted that if, as Sangiovanni

represented, "all of these things have been taken care of already, really the only outstanding issue

would be the fire escape" (*Id.* at 27).

---

[11] Sangiovanni explains that following Knox's inspection finding the basement apartment unpermitted, "the beds had been removed as instructed, and while Chestnut Hill was attempting to relocate the other downstairs resident[,] [h]e called emergency services to report that his own belongings were blocking the door to his bedroom. (Dkt. No. 92-1, ¶ 51).

### 7.    Engineer's Report on Fire Escape

On or about May 24, 2023, Stinemire provided a letter to Sangiovanni concerning his April 26, 2023 inspection of the fire escape. (Dkt. No. 92-6, at 11). Stinemire identified several items in need of repair, *see supra* Part II.C.4, and Stinemire further stated:

> This report is based on a field inspection of the subject fire escape only and represents the observation of conditions found at the time of inspection. Areas that were concealed or inaccessible at the time of inspection and that could not be visually observed are not covered as part of this inspection. This is a condition inspection only and does not include any comments, representations or conclusions regarding the design, analysis, load capacity, or overall design and suitability of the subject fire escape.

(Dkt. No. 92-6, at 11).

On or about May 30, 2023, Attorney Lanny Walter, on behalf of Chestnut Hill, sent Chair Platte a copy of Stinemire's report and pictures and stated that the "two remaining issues with the steel fire escape" identified by Stinemire in his May 24 report "have been remedied." (Dkt. No. 19-53, at 2). Attorney Walter represented that both issues were "routine maintenance items that do not jeopardize the integrity of the fire escape and pose no danger to anyone." (*Id.*). Attorney Walter further stated that Chestnut Hill "remains in compliance with the conditions set in the Resolution dated April 16, 2019 approving the Site Plan/Special Permit," attached a copy of the "form agreement" each resident signs "notifying the resident of the terms governing the occupancy," provided the name and contact information for the on-site manager, and stated that the stove had been disabled. (*Id.* at 2–3).

### 8.    Update Regarding Resident in Basement

In a letter to Knox dated June 5, 2023, Attorney Walter wrote that after Sangiovanni "boarded up the bedroom in the basement," one of the residents had "set up camp in the basement" with "a make shift bed which now includes a hammock hanging in front of the Exit

14

door." (Dkt. No. 19-33, at 2). Attorney Walter reported that Sangiovanni had told the resident "to depart" and had "asked for [Knox's] assistance and that of the police" but they had "failed to act." (*Id.*). Attorney Walter requested that Knox "proceed to remove him with the help of police if need be." (*Id.*). In a letter to Knox dated June 9, 2023, Attorney Walter indicated that the resident was still in the basement and asked Knox to "[p]lease get him removed." (Dkt. No. 19-34, at 2).[12] There is no indication in the record of a response, if any.

At the June 20, 2023 Planning Board meeting, Sangiovanni advised that his attorney was sick and requested that consideration of Chestnut Hill's renewal application be postponed. (Dkt. No. 19-40, ¶ 41). The Planning Board granted the request and tabled the renewal application for the fourth time. (*Id.*).

### 9.     Department of Building and Safety Inspection

On July 14, 2023, Knox again inspected Chestnut Hill and noted the "[b]asement entrance is now clear and tenant has moved to a new location." (Dkt. No. 19-55, at 2). Knox reported that the fire escape repairs had been made and that he had informed Sangiovanni that a "NYS licensed design professional (engineer) still needed to a submit a letter stating the fire escape is structurally sound (NYSFC 1104.16,51)." (*Id.*).

### 10.     Fourth Planning Board Meeting

At the July 17, 2023, Chair Platte observed that there had been an "unfortunate incident" at Chestnut Hill the previous week—two individuals had overdosed, one of whom had died.[13]

---

[12] In an affidavit, Knox states that his department "is not empowered to forcibly evict tenants, who may have additional rights under New York law" and that he "could not comply with this request." (Dkt. No. 19-22, ¶ 26).

[13] On July 13, 2023, emergency responders were called to Chestnut Hill for the drug overdoses of two residents, one of which did not survive." (Dkt. No. 89-8, ¶ 40; Dkt. No. 92-11, ¶ 38). Plaintiffs deny this statement of material fact as "incomplete," and citing Sangiovanni's declaration in support. (Dkt. No. 92-11, ¶ 38 (citing Dkt. No. 92-1, ¶ 38)). In his declaration, Sangiovanni explains that:

> In July 2023, we had two residents in recovery who shared a room. Both had been
> progressing well, participating in house activities, and contributing to the overall

(Dkt. No. 19-14, at 4). Chair Platte stated that the Planning Board had given Chestnut Hill "different approvals . . . over the years" but that there did not "necessarily seem that there's proper oversight" by "the manager for the day-to-day operations for the population that it serves there." (*Id.*). When Sangiovanni asked "[h]ow's that?," Chair Platte responded that "we have a number of incidents like this happening, you know, unfortunately last week." (*Id.* at 5). Sangiovanni asked "[w]hat number of incidents," Chair Platte responded that there had "been the police reports that have been generated for this particular . . . property" and that these reports had been "numerous over the years." (*Id.*). Attorney Walter then asked "[w]hat years . . . are you talking about?" but received no response. (*Id.*).

Next, Chair Platte turned to the issue of the fire escape and noted that "Mr. Stinemire has basically approved . . . the condition of the fire escape." (*Id.* at 6). Attorney Walter stated that "everything was fixed," including the recent issues. (*Id.*). Cahill asked whether Stinemire had been back to certify that the repairs "were done appropriately?" and Chair Platte noted that the Planning Board had "been asking for a report from an engineer certifying that the structure is suitable for occupancy." (*Id.* at 5–7). Attorney Walter responded that nothing in any of Stinemire's reports indicated that the fire escape was "a danger to anybody," and that they had asked Stinemire to come back but "that this particular engineer won't come back." (*Id.* at 7). At that point, Corporation Counsel informed Sangiovanni that structural certification was required pursuant to the New York fire code. (*Id.* at 9). Attorney Walter observed that the questions from the Planning Board suggested that the Board was not going to renew the permit and would

---

living experience. As sometimes will happen with addiction, one or both of them relapsed without our knowledge. As I understand it, they may have ultimately used a deadly combination of heroin and fentanyl, which killed one of the two. The survivor notified us, and we contacted emergency services.

(Dkt. No. 92-1, ¶ 38).

"eventually try to put 40 people out on the street," and Sangiovanni stated that he would be "filing for an injunction" in federal court. (*Id.* at 16–17). In response, Chair Platte noted "the period of time" between the annual renewals and approvals of the Special Use Permit, and stated: "From where I sit there's been . . . a consistent disregard for the . . . parameters in the special permits. We've had a number of beds that have been put in . . . places that . . . [they] should not be put in." (*Id.* at 17). Sangiovanni acknowledged that there had been "one bed" and asked Chair Platte to "[s]how [him] a . . . letter from the building department." (*Id.* at 18). Cahill responded that the basement bedroom was not on the floor plan and suggested that Sangiovanni had "installed those rooms recently," which Sangiovanni denied and argued that the basement bedroom had not been an issue until the recent inspections. (*Id.* at 18–19).

Chair Platte then stated that "[a]nother thing that was disregarded for three years was the . . . fire alarm system." (*Id.* at 19). Sangiovanni responded that he had owned the building for ten years, asked why the fire alarm system was "being brought up now," and noted that he had spent "thousands of dollars" to bring the system, which had been "installed in the 1970s or 80s," into operation. (*Id.* at 19–20). Chair Platte responded that it had taken "three years of us talking about it" before the fire alarm system was repaired, which Sangiovanni disputed and asserted that "this just happened, it didn't take three years." (*Id.* at 21).

After further argument, Chair Platte told the Planning Board that he had "two resolutions," "[o]ne is to approve the special permit renewal and one is to deny the special permit renewal." (*Id.* at 29). Chair Platte further stated "we've had . . . the applicants here a number of times in the past . . . and if you agree that we should deny based on what we've talked about tonight and at previous meetings with compliance issues . . . I'd like to know" and asked for comments. (*Id.*).

Board member Robert Jacobsen stated that "generally speaking they have made an attempt to correct some of these items . . . although it's taken some time" but that the building department, many times, had not provided "written reports" and that he was "struggling" because "if something was to the level of . . . an endangerment to the residents . . . the building department would have posted the building and shut them down" but that it seemed "like they're working with the applicant" but that they were "not getting full reports" and he was having "a hard time denying an application" when he was getting "half the information on one side and half the information [on] the other." (*Id.* at 29–30). As to the fire escape certification, Jacobsen stated that there was nothing suggesting "immediate danger" and that they were "at the stage of paperwork." (*Id.* at 30).

After further discussion between Sangiovanni, Attorney Walter, Chair Platte, and Corporation Counsel about the fire escape; the need for a "licensed engineer" to attest to structural soundness; the difficulty Sangiovanni was having obtaining a report from Stinemire; the possibility of finding another engineer"; and the repairs made, Chair Platte moved to "deny renewing the special permit." (*Id.* at 30–37). The Planning Board denied renewal—four board members voted "yes" and board member Jacobsen voted "no." (*Id.* at 44–45; Dkt. No. 89-8, ¶ 44; Dkt. No. 92-11, ¶ 44).

The resolution provided, in relevant part:

> Whereas, violations were cited by the Department of Building, Safety, and Zoning in 2021 ordering corrective action by July 26, 2021, and additional violations were cited on October 20, 2021, May 10, 2022, April 12, 2023.
>
> Whereas, the violation of fire safety requirement 704.1 cited on the 10/20/2021 violation notice was not remedied until May 1, 2023 leaving the fire alarm notification system to remain inoperable during that time period; and

Whereas, after inspection by the Building Department for the current renewal, violations were cited by the Building & Safety Department on April 12, 2023 and the number of residents in the carriage house was to be decreased; and

Whereas, on October 20, 2021 and again on April 12, 2023 violations were cited of NYS 1104.16.5.1, pertaining to the exterior metal fire escape used as a primary means of resident ingress and egress; and

Whereas on April 26, 2023 an engineer hired by applicant conducted a condition inspection of the exterior steel fire escape, which is used by residents as a regular means of ingress and egress; and

Whereas, the engineer's letter to the applicant, dated May 24, 2023, reports that "One of the diagonal bracing components for the fire escape has been cut 90% through the member. This bracing member will need to be removed and replaced with a member of the same size and shape." And "One horizontal railing component at the upper-level landing is not securely fastened to the building. All railing components need to be securely attached so that they do not move. Wood blocking needs to be installed in the exterior to allow for a secure connection."; and

Whereas the engineer indicated that the letter "is a condition inspection only and does not include any comments, representations or conclusions regarding the design, analysis, load capacity, or overall design and suitability of the subject fire escape"; and

Whereas, on May 30, 2023, applicant sent photographs showing repairs to the exterior steel fire escape but has not submitted any report from an engineer, or qualified professional, addressing the structural adequacy, safety, and load bearing capacity of the exterior steel fire escape, in compliance with the Uniform Fire Safety and Building Code; and

Whereas, in June 2023 applicant reported that a resident is sleeping in the basement and blocking the basement fire escape in violation of the building code and the violation was confirmed by the building department; and

Whereas, repeated and recurring issues have continued which include issues of public safety, such as the fire escape condition and maintenance, the fire alarm system not being fully operational at all times, obstacles and debris collecting in egress pathways; and

19

> Whereas, the Planning Board has determined that the conditions set forth in the permit have not been complied with and, pursuant to section 405-32(D), a period of more than 60 days was given the application to bring the property into full compliance.

(Dkt. No. 19-57, at 3–4).

## III.    STANDARD OF REVIEW

Under Rule 56(a), summary judgment may be granted only if all the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*, 477 U.S. at 248). The movant may meet this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322; *see also Selevan v. N.Y. Thruway Auth.*, 711 F.3d 253, 256 (2d Cir. 2013) (explaining that summary judgment is appropriate where the nonmoving party fails to "'come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on' an essential element of a claim" (quoting *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 509 (2d Cir. 2010))).

If the moving party meets this burden, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248, 250; *see also Celotex*, 477 U.S. at 323–24; *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). "When ruling on a

summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003). Still, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and cannot rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986) (citing *Quarles v. Gen. Motors Corp.*, 758 F.2d 839, 840 (2d Cir. 1985)). Furthermore, "[m]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (quoting *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995)).

## IV.    DISCUSSION

The FHA makes it unlawful "[t]o discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap of" the buyer or renter or any person associated with that buyer or renter or "[t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap." 42 U.S.C. §§ 3604(f)(1) and (2). The ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. "Due to the similarities between" the FHA and ADA, courts consider intentional discrimination claims under them "in tandem." *Tsombanidis v. W. Haven Fire Dep't*, 352 F.3d 565, 573 n.4 (2d Cir. 2003). "To establish discrimination under either the [FHA] or the ADA, plaintiffs have three available theories: (1) intentional discrimination (disparate

21

treatment); (2) disparate impact; and (3) failure to make a reasonable accommodation."

*Tsombanidis*, 352 F.3d at 573. In this case, Plaintiffs claim intentional discrimination (disparate

treatment). (*See generally* Dkt. No. 92).

     The Court considers "claims of intentional discrimination under the FHA [and] the ADA

. . . under the familiar *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), burden-shifting

analysis established for employment discrimination cases." *Reg'l Econ. Cmty. Action Program,*

*Inc. v. City of Middletown ("RECAP")*, 294 F.3d 35, 48–49 (2d Cir. 2002), *superseded by statute*

*on other grounds as recognized in Anderson Grp., LLC v. City of Saratoga Springs*, 805 F.3d 34,

46 (2d Cir. 2015). "To establish *a prima facie* case of discrimination under the FHA and the

ADA, the plaintiffs must present evidence that 'animus against the protected group was a

significant factor in the position taken by the municipal decision-makers themselves or by those

to whom the decision-makers were knowingly responsive.'" *Id*. at 49 (quoting *LeBlanc–*

*Sternberg v. Fletcher*, 67 F.3d 412, 425 (2d Cir. 1995)). "If the plaintiffs make out a *prima facie*

case, then the burden of production shifts to the defendants to provide a legitimate,

nondiscriminatory reason for their decision." *RECAP*, 294 F.3d at 49. "If the defendants meet

that burden," the burden returns to the plaintiffs, who "must then prove that the defendants

intentionally discriminated against them on a prohibited ground." *Id*. "Where, however, the

plaintiffs 'make a substantial showing' that the defendants' proffered explanation was false, 'it is

permissible for the trier of fact to infer the ultimate fact of discrimination from the falsity of the

employer's explanation.'" *Id.* (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133,

146–47 (2000)).

    **A.**    **Prima Facie Case**

     Defendant argues that Plaintiffs have failed to establish a prima facie case because they

have presented no evidence that "discriminatory animus toward individuals with disabilities was

a significant motivating factor in" the Planning Board's decision to deny renewal of the Special

Use Permit. (Dkt. No. 89-7, at 21). Plaintiffs respond that evidence showing a history of

discrimination by the City against Chestnut Hill and the bias, the disability-related animus and

stereotyping reflected in comments made at the March 2023 public hearing, and the irregularity

of the special permit process itself, adequately establishes a prima facie case of disparate

treatment. (Dkt. No. 92, at 14–16).

   "Because discriminatory intent is rarely susceptible to direct proof, a district court facing

a question of discriminatory intent must make 'a sensitive inquiry into such circumstantial and

direct evidence of intent as may be available. The impact of the official action whether it bears

more heavily [the disabled] . . . may provide an important starting point.'" *Mhany Mgmt., Inc. v.*

*Cnty. of Nassau*, 819 F.3d 581, 606 (2d Cir. 2016) (quoting *Vill. of Arlington Heights v. Metro.*

*Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977)). "But unless a 'clear pattern, unexplainable on

grounds other than [disability], emerges,' 'impact alone is not determinative, and the Court must

look to other evidence.'" *id.* (quoting *Arlington Heights*, 429 U.S. at 267). "Other relevant

considerations for discerning a . . . discriminatory intent include '[t]he historical background of

the decision . . . particularly if it reveals a series of official actions taken for invidious purposes,'

'[d]epartures from the normal procedural sequence,' '[s]ubstantive departures,' and '[t]he

legislative or administrative history . . . especially where there are contemporary statements by

members of the decisionmaking body, minutes of its meetings, or reports,'" *Id.* (internal citations

omitted) (quoting *Arlington Heights*, 429 U.S. at 267–68); *see also Fortune Soc'y v. Sandcastle*

*Towers Hous. Dev. Fund Corp.*, 388 F. Supp. 3d 145, 177 (E.D.N.Y. 2019) ("This other

evidence includes whether the historical background of the policy reveals a series of actions

taken for invidious purposes, departures from normal procedure and contemporary statements or

information." (citing *Arlington Heights*, 429 U.S. at 267)). The "initial burden of production

under the *McDonnell Douglas* analysis is 'minimal.'" *RECAP*, 294 F.3d at 49 (quoting *St.*

*Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993)).

### 1.    Historical Background and Community Opposition

Viewed in the light most favorable to Plaintiffs, there is evidence of official and

community-based opposition to Chestnut Hill beginning in 2014, when Sangiovanni took over its

operation. In his declaration, Sangiovanni references Chestnut Hill's litigation history, including

a comment by the City's former mayor, who opposed a boarding house that allowed disabled

residents; community opposition toward a home for the disabled; this Court's issuance of a TRO;

and the eventual settlement after the Zoning Board of Appeals and Planning Board granted a

zoning variance and Special Use Permit in 2019. (Dkt. No. 92-1, ¶¶ 8, 12–27 (citing *Chestnut*

*Hill I*, Dkt. No. 19, at 5)). Although the Court did not credit historical background at the

preliminary injunction stage, it made this determination following an evidentiary hearing and

guided by a different standard of review. A jury, however, could reasonably infer discriminatory

intent from the history of community and official opposition to the operation of Chestnut Hill as

a group home for the disabled.

Plaintiffs additionally argue that the comments by community residents at the Planning

Board's March 2023 public hearing show disability animus. The Court agrees. The first speaker,

who appears to be related to Cahill, (Dkt. No. 92-1, ¶ 31), stated "[h]ere we are again several

years in . . . the same song and dance to operate a rooming and boarding house at 106 West

Chestnut Street. I won't waste time enumerating the problems associated with the operation of

this business . . . you've heard them before. Unlike you, though, those of us in the neighborhood

are forced to live with *them*," (Dkt. No. 19-11, at 3 (emphasis added)). The second speaker

objected to the "manner in which [the boarding house is] operated," stated "[w]e have all heard

the phrase not in my backyard" and that Chestnut Hill is in her backyard, and questioned whether there were "handicapped entrances for the physically disabled who may be living there?" (*Id.* at 5–6). Even if well-intentioned, the comment regarding "handicapped entrances" are nonetheless disability-based. *See Laflamme v. New Horizons, Inc.*, 605 F. Supp. 2d 378, 394 (D. Conn. 2009) ("A discriminatory housing practice is still unlawful even if made with good intentions if it denies housing to individuals with disabilities based on their disabilities."). Another speaker expressed concern "about what goes on there," noting that he had a daughter and was going to have a granddaughter "living close to this house," and another suggested that the Planning Board should work with "Social Services to find suitable homes" for the residents of Chestnut Hill. (Dkt. No. 92-7, at 4–5; *see also* Dkt. No. 19-11 (transcript)). Viewing these statements collectively and in the light most favorable to Plaintiffs, a factfinder could infer community opposition to Chestnut Hill based on the disabilities of its residents. *See*, *e.g.*, *Mhany Mgmt., Inc.*, 819 F.3d at 608–10 (finding district court reasonably inferred racial animus from comments at public hearing by community residents opposing affordable housing, where comments, while not "explicitly racial," expressed concern about "flavor" and "character" of neighborhood). Further, these comments were made directly to the Planning Board at the first of the four meetings that resulted in the denial of the special permit renewal application. The Court therefore concludes Plaintiffs have satisfied their minimal burden of showing a prima facie case of disparate treatment.

### 2.    Different Treatment

Defendants argue that to the extent Plaintiffs assert that the City treated Chestnut Hill differently than other group living facilities based on disability, Plaintiffs have failed to offer evidence of a "relevant comparator that received preferential treatment." (Dkt. No. 89-7, at 26). Plaintiffs respond that "Sangiovanni has testified to his personal experience operating, and the

City's differential treatment of two other similarly situation group living facilities." (Dkt. No. 92, at 19). Sangiovanni testified that Elizabeth Manor "was not required to get a special permit ever" but that it closed down in 2020 due to "[f]ire and water damage." (Dkt. No. 89-2, at 203). This vague and conclusory evidence is insufficient to allow an inference of discriminatory intent. *See De La Fuente v. Sherry Netherland, Inc.*, No. 17-cv-4759, 2019 WL 3430207, at *12, 2019 U.S. Dist. LEXIS 126890, at *37 (S.D.N.Y. July 30, 2019) (finding no "affirmative evidence of discriminatory intent in the absence of evidence "that the Board treated differently any comparator, i.e., any non-minority applicant [for an apartment] factually akin to [the plaintiff]"). There are also references in the record to "Chiz's Heart Street" as a group home but there are no factual details that would allow comparison. (Dkt. No. 92-1, ¶ 28).

### 3.      Irregularity of Special Use Permit Process

Plaintiffs argue that the City "forced" Chestnut Hill "to undergo a special permit process not required of comparable uses." (Dkt. No. 92, at 15). The settlement of *Chestnut Hill I* on September 11, 2019, *see Chestnut Hill I*, Dkt. No. 74, was precipitated by: (1) the City Zoning Board of Appeals' grant of a variance allowing Chestnut Hill to operate as a boarding house in an R-1 zone "in accordance with the special permit provisions applicable in an R-2 zone, on such terms and conditions as approved by the Planning Board," (Dkt. No. 19-41, at 2–3); and (2) the Planning Board's issuance of a "special use permit on April 15, 2019, subject to certain conditions," (Dkt. No. 19-40, ¶ 6; *see also* Dkt. No. 19-43, at 3–4 ("Special Permit for #106 West Chestnut)). The Court finds no basis for an inference of disability discrimination in the imposition of the Special Use Permit or in its terms or conditions. The Planning Board issued the permit following Chestnut Hill's application and it was a basis for the ultimate settlement and release in *Chestnut Hill I.* (*See* Dkt. No. 89-6, at 3–4 (General Release)). The Court therefore concludes that no reasonable factfinder could infer discriminatory intent from the Special Use

Permit under the circumstances of this case. *See*, *e.g.*, *Meraki Recovery Hous., LLC v. City of Coon Rapids, Minnesota*, No. 20-cv-0203, 2021 WL 5567898, at *1, *6, 2021 U.S. Dist. LEXIS 228417, *2, *13 (D. Minn. Nov. 29, 2021) (finding the fact that the city created a reasonable-accommodation process in response to [the plaintiffs'] initial request "for an exception to the zoning ordinance so that a group of residents could live in a sober home "actually *favored plaintiffs*," explaining that "[t]he City did not change an existing process in a way that disadvantaged disabled residents; to the contrary, it . . . create[ed] a reasonable-accommodation process").

### B.     Nondiscriminatory Reasons

Once a plaintiff establishes a prima facie case, the burden shifts to Defendants "to provide a legitimate, nondiscriminatory reason for their decision." *RECAP*, 294 F.3d at 49. As relevant here, the July 17, 2023 resolution cites the following reasons for the Planning Board's decision to deny Plaintiffs' application for renewal of the special use permit: (1) Building Safety's findings of violations "in 2021, ordering corrective action by July 26, 2021," and additional violations "on . . . May 10, 2022, and April 12, 2023," including a violation with respect to "the number of residents in the carriage house"; (2) Plaintiffs' failure to remedy the "violation of fire safety requirement 704.1 cited on the 10/20/2021 violation notice . . . until May 1, 2023 leaving the fire alarm notification system to remain inoperable during that time period"; (3) Building Safety's finding "on October 20, 2021 and again on April 12, 2023," that Plaintiffs were in violation of "NYS 1104.16.5.1," that the letter Plaintiffs provided from their engineer regarding the fire escape expressly disclaimed any representations regarding "the design, analysis, load capacity, or overall design and suitability of the subject fire escape," and Plaintiffs' failure to submit a report from an engineer "addressing the structural adequacy" of the fire escape; (4) "in June 2023 applicant reported that a resident is sleeping in the basement and

blocking the basement fire escape in violation of the building code"; and (5) the "continu[ing]," "repeated and recurring issues . . . which include issues of public safety, such as the fire escape condition and maintenance, the fire alarm system not being fully operational at all times, obstacles and debris collecting in egress pathways." (Dkt. No. 19-57, at 3–4). Although Plaintiffs dispute the validity of these reasons for the Planning Board's denial of the renewal application, the Court finds that Defendant has produced evidence of legitimate, nondiscriminatory reasons. Thus, the burden returns to Plaintiffs.

### C.    Motivating Factor

"If a defendant meets its burden of production, 'the sole remaining issue is discrimination *vel non*. The plaintiffs . . . must prove that the defendants intentionally discriminated against them on a prohibited ground.'" *Mhany Mgmt., Inc.*, 819 F.3d at 613 (quoting *RECAP*, 294 F.3d at 49). "The binding precedent of [the Second] Circuit establishes that a plaintiff bringing a disparate treatment claim for discrimination under Section 804(f) of the FHA must show that a protected characteristic was one motivating factor causing the defendant's actions taken against the plaintiff." *Gilead Cmty. Servs., Inc. v. Town of Cromwell*, 112 F.4th 93, 99 (2d Cir. 2024); *see also Mhany Mgmt., Inc.*, 819 F.3d at 613 ("[A] plaintiff bears the burden of proof in showing that the adverse action was motivated, at least in part, by an impermissible reason.") (quotation marks omitted). "Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Arlington Heights*, 429 U.S. at 266.

Here, Plaintiffs rely on their prima facie case and argue that the City has provided "shifting rationales" for the denial of Chestnut Hill's application for renewal of the Special Use Permit, and that reasons are pretextual. (Dkt. No. 92, at 16–17). Specifically, Plaintiffs assert that the Planning Board's "shifting rationales—moving from vague safety claims to generalized

concerns about overdoses—lack contemporaneous evidentiary support and rest on stigma." (*Id.*

at 16). Shifting or changing reasons for an adverse action may raise an issue of fact as to whether

a stated reason is a pretext for discrimination. *See*, *e.g.*, *EEOC v. Ethan Allen, Inc.*, 44 F.3d 116,

120 (2d Cir. 1994) (identifying fact issue where defendant offered "inconsistent explanations for

its decision to terminate" employee and concluding that a reasonable juror could conclude

"[f]rom such discrepancies" that the defendant's explanations were pretextual). Here, however,

while the Planning Board discussed the overdoses reported to have occurred at Chestnut Hill and

voiced concerns about oversight at the March 2023 and July 2023 meetings, Plaintiffs identify no

evidence that the Planning Board voted to deny renewal based on the overdoses or oversight

issues, or for any reasons other than those identified in the resolution.

Next, Plaintiffs challenge the reasons the Planning Board identified for denying Chestnut

Hill's application as pretext for unlawful disability discrimination. Plaintiffs assert that the

Planning Board's reliance on Chestnut Hill's alleged two-year delay in repairing the fire alarm

system was unfounded, and, in any event, moot, as it had been repaired. (Dkt. No. 92-1, ¶ 47).

Here, Plaintiffs have adduced evidence calling into question the length of delay (if any) between

notice of violation and repair. According to Sangiovanni, "the 10/20/21 notice had nothing to do

with the fire alarm notification system, it related to the separate Ansel system in the kitchen."

(Dkt. No. 92-1, ¶ 47). There is also evidence that Sangiovanni had the fire alarm system repaired

within weeks of being notified of the violation. (Dkt. No. 19-14, at 21). But even assuming the

Planning Board's reliance on Chestnut Hill's two-year delay in repairing the fire alarm

notification system was pretextual, there is no evidence from which a factfinder could conclude

it was a pretext to hide a discriminatory motive. *See Texas Dep't of Cmty. Affairs v. Burdine*, 450

U.S. 248, 253 (1981) (explaining that the plaintiffs bear the ultimate burden of demonstrating

that "the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination"). Plaintiff does not, for example, identify any comments by Planning Board members or other City officials during any of the four Planning Board meetings from which a factfinder could infer discriminatory intent.

Plaintiffs also challenge the Planning Board's reliance on Chestnut Hill's failure to provide a report from a qualified engineer addressing the structural adequacy of the fire escape as a reason for refusing to renew the Special Use Permit.[14] (*See* Dkt. No. 92-1, ¶ 48). Sangiovanni avers that the Planning Board "was provided with three reports by a NYS Licensed Professional Engineer." (*Id.*). Plaintiffs do not dispute, however, that they failed to provide an engineer's report certifying the structural integrity of the fire escape and cite no authority for the proposition that Stinemire's reports, which expressly disclaimed any opinion on structural sufficiency, were adequate.

Viewed in the totality, the evidence of discrimination is concentrated in the early days of Chestnut Hill's operation and the continued community opposition to, and bias toward, a group home for the disabled. But in the absence of evidence calling into question the Planning Board's stated reasons for denying Chestnut Hill's application to renew the Special Use Permit, or evidence (other than an extended-familial relationship between one of the more vocal opponents in the community and Cahill) that the Planning Board was influenced by the community opposition, a factfinder has no basis on which to conclude that disability discrimination was a motivating factor in the Planning Board's denial. *See Budnick v. Town of Carefree*, 518 F.3d

---

[14] The Court has endeavored to construe Plaintiffs' submissions generously to discern their arguments. The entirety of their briefing on pretext is the following: "Kingston's reasons collapse as pretext. The four reasons given for denying the special permit are chimerical." (Dkt. No. 92, at 16). The majority of their argument on "Pretextual Justifications" concerns the statements by community members at the March 2023 public hearing as evidence of discriminatory motive.

1109, 1117–18 (9th Cir. 2008) ("There is no evidence in the record to suggest that the cited comments or similar ones . . . motivated the commissioners or Town Council members to vote against the SUP, and we decline to make such an inference based solely on the fact that the comments were made."). Accordingly, the Court finds Defendant is entitled to summary judgment as a matter of law.

**V.    CONCLUSION**

For these reasons, it is

**ORDERED** that Defendant's motion for summary judgment (Dkt. No. 89) is **GRANTED**; and it is further

**ORDERED** that the Amended Complaint (Dkt. No. 58) is **DISMISSED**; and it is further

**ORDERED** that the Clerk is directed to enter Judgment accordingly and close this case.

**IT IS SO ORDERED.**

Dated: <u>March 9, 2026</u>
Syracuse, New York

Brenda K. Sannes
Chief U.S. District Judge

31